CLERK'S OFFICE U.S. DIST COURT
AT ROANOKE, VA
FILED
DEC 0 8 2009
JOHN F. CORCORAN, CLERK
BY:
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

JOHNNIE SMITH, )
)
)
Plaintiff, )
) Civil Action No. 3:08cv00030
v. )
)
THE JAMES C. HORMEL SCHOOL )
OF THE VIRGINIA INSTITUTE OF )
AUTISM )  By: Michael F. Urbanski
)  United States Magistrate Judge
and )
)
GREENE COUNTY SCHOOL BOARD, )
)
Defendants. )
)

## REPORT AND RECOMMENDATION

Plaintiff Johnnie Smith[1] filed this action by and through his parents and on their behalf,

pursuant to the Individuals with Disabilities in Education Act, 20 U.S.C. § 1400, et seq.,

challenging the finding by a due process hearing officer that Greene County School Board

("Greene County") provided Johnnie with a free and appropriate public education. Plaintiff also

asserts a breach of contract claim against The James C. Hormel School of The Virginia Institute

of Autism ("VIA") as third party beneficiary to its contract with Greene County, through which

Greene County purchased educational services for Johnnie. VIA, in turn, has filed a

counterclaim against Plaintiff alleging defamation (Count I) and fraud (Count II).

---

[1] Johnnie Smith ("Johnnie") is the fictitious name for the autistic child whose education is at
issue in this case. The Individuals with Disabilities in Education Act gives procedural rights to
children with disabilities and their parents. See 20 U.S.C. § 1415(a). References to Plaintiff
encompass both Johnnie and his parents whenever appropriate.

By Order dated December 29, 2008, all pretrial motions in this case were referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b)(1). This matter is currently before the court on Greene County's Motion for Summary Judgment (Docket #124); Plaintiff's Motion for Partial Summary Judgment for Denial of a Free and Appropriate Public Education to Plaintiff Johnnie Smith (Docket #160); VIA's Motion for Summary Judgment (Docket #126); Plaintiff's Motion for Partial Summary Judgment on Contract Claims (Docket #161); and Plaintiff's Motion to Dismiss VIA's Counterclaim (Docket #96). These motions have been briefed by the parties and were argued on September 22, 2009. Subsequently, VIA filed a Motion for Leave to File Deposition Transcript Under Seal (Docket #184).

After careful review of the administrative record, the parties' arguments and the governing legal principles, the undersigned concurs with the hearing officer's conclusion that Greene County adequately complied with its requirements under the IDEA. Additionally, Plaintiff's breach of contract claim against VIA fails as a matter of law because there has been no actionable breach of the contract, and Plaintiff has no colorable claim for damages. With respect to its counterclaim, VIA has alleged sufficient facts to support an actionable claim of defamation, but has not pled the requirements of fraud with specificity. As such, it is **RECOMMENDED** that Greene County's Motion for Summary Judgment (Docket #124) be **GRANTED**; Plaintiff's Motion for Partial Summary Judgment for Denial of a Free and Appropriate Public Education to Plaintiff Johnnie Smith (Docket #160) be **DENIED**; VIA's Motion for Summary Judgment be **GRANTED** (Docket #126); Plaintiff's Motion for Partial Summary Judgment on Contract Claims be **DENIED** (Docket #161); VIA's Motion for Leave to File Deposition Transcript Under Seal (Docket #184) be **DENIED**; and Plaintiff's Motion to Dismiss VIA's Counterclaim (Docket #96) be **DENIED** as to Count I and **GRANTED** as to

Count II. It is further **RECOMMENDED** that the court exercise its supplemental jurisdiction and retain the defamation counterclaim.

## I. STATUTORY FRAMEWORK

This action involves an alleged violation of the Individuals with Disabilities Education Act ("IDEA" or "the Act"), 20 U.S.C. § 1400, et seq. Congress enacted the IDEA, in part, to "ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A). Accordingly, as a condition of federal financial assistance under the Act, states must provide disabled children with a free appropriate public education ("FAPE"). 20 U.S.C. § 1412(a)(1)(A).

FAPE, as defined in the Act, must include special education and related services that: (a) have been provided at public expense, under public supervision and direction, and without charge; (b) meet the standards of the state educational agency; (c) include an appropriate preschool, elementary school, or secondary school education in the state involved; and (d) are provided in conformity with the individualized education program. 20 U.S.C. § 1401(9); 34 C.F.R. § 300.17. The Act does not explicitly define what is meant by an "appropriate" education, and neither the face of the Act itself nor the legislative history indicates a congressional intent that such education meet a specific substantive standard. Bd. of Educ. v. Rowley, 458 U.S. 176, 188-90 (1982);[2] see also Kirkpatrick v. Lenoir Co. Bd. of Educ., 216 F.3d

---

[2] Rowley addresses the Education of the Handicapped Act, which was subsequently amended and renamed the IDEA in 1990. Pub. L. No. 101-476, 104 Stat. 1103. For ease of reference, this opinion refers only to the IDEA, even when discussing the Act prior to the 1990 amendments. See Gadsby ex rel. Gadsby v. Grasmick, 109 F.3d 940, 942 n.1 (4th Cir. 1997).

380, 383 (4th Cir. 2000) ("The IDEA provides very little by the way of substantive standards to determine whether a child is receiving a free appropriate public education.").

In Rowley, the Supreme Court declined to establish a single test for determining the adequacy of educational benefits conferred upon children under the Act. 458 U.S. at 202. Rather, the Court held that a state satisfies the FAPE requirement "by providing personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction." Id. at 203. Progress (or the lack thereof) is not dispositive with respect to whether a child receives FAPE. M.S. ex rel. Simchick v. Fairfax Co. Sch. Bd., 553 F.3d 315, 327 (4th Cir. 2009); In re Conklin v. Anne Arundel Co. Bd. of Educ., 946 F.2d 306, 313 (4th Cir. 1991). The IDEA does not require the school district to provide a disabled child with the best possible education, M.M. ex rel. D.M. v. Sch. Dist., 303 F.3d 523, 526 (4th Cir. 2002) (citing Rowley, 458 U.S. at 192), or maximize each handicapped child's potential. Hartmann v. Loudoun Co. Bd. of Educ., 118 F.3d 996, 1001 (4th Cir. 1997) (quoting Rowley, 458 U.S. at 199).

The Act requires that FAPE be "tailored to the unique needs of the handicapped child by means of an 'individualized educational program' (IEP)." Rowley, 458 U.S. at 181-82. The IEP is prepared at a meeting between a qualified representative of the local educational agency ("LEA"),[3] the child's teacher, the child's parents or guardian and, where appropriate, the child. 20 U.S.C. § 1414(d)(1)(B); Honig v. Doe, 484 U.S. 305, 311 (1988); 34 C.F.R. § 300.321(a). The IEP must contain "statements concerning a disabled child's level of functioning, set forth measurable annual achievement goals, describe the services to be provided, and establish objective criteria for evaluating the child's progress." M.M. ex rel. D.M., 303 F.3d at 527 (citing

---

[3] LEA is defined in 20 U.S.C. § 1401(19)(A) as "a public board of education or other public authority legally constituted within a State for either administrative control or direction of, or to perform a service function for, public elementary schools or secondary schools in a city, county, township, school district, or other political subdivision of a state. . . ."

20 U.S.C. § 1414(d)(1)(A)); see also 34 C.F.R. § 300.320(a). An IEP must be reviewed once per year to ensure the child is receiving FAPE. Honig, 484 U.S. at 311; 34 C.F.R. § 300.324(b)(1). In some situations, "evidence of *actual progress* may be relevant to a determination of whether a challenged IEP was reasonably calculated to confer some educational benefit." M.S. ex rel. Simchick, 553 F.3d at 326-27 (emphasis in original). Prior written notice must be given to the parents of a child whenever the LEA proposes to initiate or change the identification, evaluation, or placement of the child, or the provision of FAPE to the child. 20 U.S.C. § 1415(b)(3).

The IDEA establishes certain procedural safeguards to ensure the provision of FAPE by a state educational agency ("SEA")[4] or LEA. 20 U.S.C. § 1415; see also 8 Va. Admin. Code § 20-80-70.[5] One such safeguard is the opportunity for an impartial due process hearing. 20 U.S.C. § 1415(f)(1)(A); see also 8 Va. Admin. Code § 20-80-76. Section 1415(j) of the IDEA provides that during the pendency of the proceedings, the child shall remain in the then-current placement, unless the SEA or LEA and the parents otherwise agree. At the conclusion of a due process hearing, an aggrieved party may file a civil action in federal court challenging the decision rendered. 20 U.S.C. § 1415(i)(2)(A). In such a case, the court's inquiry is twofold: (1) has the state complied with the procedures set forth in the Act, and (2) is the IEP reasonably calculated to enable the child to receive educational benefits? Rowley, 458 U.S. at 206-07. "If these requirements are met, the State has complied with the obligations imposed by Congress and the courts can require no more." Id. at 207.

---

[4] SEA is defined in 20 U.S.C. § 1401(32) as a state board of education or other agency primarily responsible for the state supervision of public elementary and secondary schools.

[5] The Virginia Board of Education repealed the text of the regulations contained in § 20-80 of Title 8 of the Virginia Administrative Code, and new regulations were promulgated and codified in § 20-81, effective July 7, 2009. 25 Va. Regs. Reg. 3849 (June 22, 2009). References to the Virginia Administrative Code in this opinion are to the sections in effect as of the date of the due process hearing.

## II. PROCEDURAL HISTORY

On December 21, 2007, Johnnie's parents filed an IDEA due process complaint with the

Virginia Department of Education naming Greene County and VIA as respondents. The

complaint contained fifteen specific requests for relief,[6] all of which were directed at VIA. The

Smiths alleged Johnnie had been wrongfully discharged from VIA and was denied FAPE.

Hearing officer John Hooe ("Officer Hooe") was appointed to preside over the

proceedings and, at the Smiths' request, ordered that VIA grant Johnnie stay-put placement

through the conclusion of the proceedings, pursuant to 20 U.S.C. § 1415(j). VIA filed a motion

to rescind the stay-put order, arguing that as a private facility it was not a proper party to the due

process proceedings and that it was not subject to the IDEA's stay-put requirement. Officer

Hooe denied the motion. VIA then requested an alternative interim placement for Johnnie,

asserting that maintaining Johnnie's placement at VIA was likely to result in injury to himself or

others. Officer Hooe denied that motion as well, holding that the private school did not have

standing to seek application of the dangerousness exception to the stay-put requirement.

VIA filed a legal challenge to Officer Hooe's stay-put ruling in the United States District

Court for the Eastern District of Virginia, arguing it was not a party to the due process

proceedings and was not bound by Officer Hooe's stay-put order. The district court declined to

intervene at an interlocutory stage of the due process proceedings and ultimately dismissed the

---

[6] In his opinion, hearing officer Peter Vaden found that the Smiths had narrowed the scope of
their requested relief over the course of the due process hearing, ultimately seeking: (a) a finding
that Johnnie's discharge from VIA was wrongful; (b) an award of compensatory education; (c)
additional evaluations, including a "parents' functional behavior assessment," a full evaluation of
the physical environment in which Johnnie was educated at VIA, and a full evaluation of
Johnnie's educational program at VIA; (d) disclosure of documents by VIA; and (e) that VIA be
required to participate in ongoing IEP meetings.

case.[7] See Va. Inst. of Autism v. Va. Dep't of Educ., 537 F. Supp. 2d 817, 823 (E.D. Va. 2008). Officer Hooe subsequently withdrew from the due process proceedings due to family concerns, and a new hearing officer, Peter Vaden ("Officer Vaden"), was appointed on January 29, 2008. On February 15, 2008, Officer Vaden overturned Officer Hooe's stay-put ruling, finding no authority under 20 U.S.C. § 1415(j) to impose an obligation on a private school to maintain a child in educational placement.

The due process hearing was conducted over the course of two days, February 28, 2008 and March 10, 2008, and included the testimony of eight witnesses. On March 25, 2008, Officer Vaden issued a twenty-three page opinion dismissing VIA from the due process proceedings as an improper party and finding that Greene County had complied with the IDEA and provided Johnnie FAPE. Specifically, Officer Vaden found that Greene County cannot be held responsible for failure to implement Johnnie's IEP, which provided for Johnnie's placement at VIA, after Johnnie was suspended from VIA's in-school programming on November 8, 2007.

Johnnie Smith filed this federal action by and through his parents and on their behalf, challenging Officer Vaden's holding that Greene County did not deny Johnnie FAPE and seeking compensatory education as a result. Plaintiff also asserts a breach of contract claim against VIA as third party beneficiary to its Principal Agreement with Greene County. In a Report and Recommendation entered April 22, 2009, the undersigned recommended that Plaintiff's IDEA claim against VIA be dismissed but that the IDEA claim against Greene County and the breach of contract claim against VIA proceed on summary judgment. The Report and Recommendation was adopted in its entirety without objection from either party. Thereafter,

---

[7] During the pendency of its federal claim, VIA did not participate in the due process hearing and thus was not present for the first day of testimony on February 28, 2008. VIA did appear for the second day of the hearing on March 10, 2008, preserving its objection that it was not a proper party to the due process proceedings.

VIA filed a counterclaim alleging defamation and fraud against Plaintiff. The case is now before the court on cross motions for summary judgment and Plaintiff's motion to dismiss the counterclaim.

## III. FACTUAL BACKGROUND[8]

Johnnie was born in 1995 and until he was two years old, he met all developmental milestones appropriately. (Administrative Record, hereinafter "R.", at A6, D40 p.6) Shortly thereafter, Johnnie's speech regressed and his behavior gradually became more difficult. (R. at A6, D40 p.6.) In March, 2000, he was diagnosed with Autism Spectrum Disorder. (R. at A6, D40 p.6.) Johnnie responded well to Applied Behavior Analysis ("ABA") therapy and one-on-one teaching methods, which were implemented at home and in school. (R. at A6.)

In 2001, Mr. and Mrs. Smith sought to enroll Johnnie at VIA, a private day school for children with autism located in Charlottesville. (R. at D40 p.6, E p.47.) The VIA staff works with students one-on-one in individual classrooms. (R. at D40 p.6.) All of VIA's 26 students are placed there under IEPs developed by the child's home public school system. (R. at D40 p.6.) Johnnie was not accepted to the VIA program initially, but after numerous applications, Johnnie was admitted for enrollment as a full-time student in the spring of 2006. (R. at D40 p.6, E p.47.) The Smith family resided in Tazewell County, Virginia at the time; VIA's Executive Director, Michael McKee, recommended that the Smiths move to Greene County, Virginia, because the county did not have a program for autistic children and would pay for Johnnie's placement at VIA in nearby Charlottesville. (R. at D40 p.6-7, E p.161.) The family moved to Greene County in time to enroll Johnnie at VIA on April 12, 2006. (R. at D40 p.7, E p.47, 161.) Johnnie initially attended VIA under his Tazewell County IEP. (R. at D40 p.7, E p.204.)

---

[8] Giving due weight to the due process hearing officer's findings, see Doyle v. Arlington Co. Sch. Bd., 953 F.2d 100, 105 (4th Cir. 1991), the undersigned adopts the following statement of facts from the evidence presented in the administrative record.

Pursuant to a contract between Greene County Community Policy and Management Team ("Greene County CPMT") and VIA (the "Principal Agreement"), Greene County CPMT took over payment for Johnnie's tuition. (R. at A10, D40 p.7, E p.203-04.) Johnnie was the only Greene County student placed at VIA at the time. (R. at D40 p.7.)

### A. Johnnie's Placement at VIA

An August 28, 2007 IEP provided for Johnnie's continued placement at VIA for the 2007-08 school year.[9] (R. at A1, B2, D40 p.7.) In the Present Level of Performance ("PLP") section of the IEP form, VIA noted that Johnnie had been exhibiting the same types of tantrum behavior present upon his enrollment at VIA,[10] including head-butting, throwing or breaking objects, hitting his head with his hand or against an object, and running away from instructors. (R. at A1, E p.51-52.) The PLP indicated that after VIA implemented a behavioral contract in May, 2007, allowing Johnnie to earn stickers during sessions where he did not hurt other people and respected property, his problem behaviors dramatically decreased. (R. at A1, D40 p.7.) The IEP noted that "[w]ith behavioral supports and a supportive and structured setting, VIA is clearly an environment where [Johnnie] will continue to excel." (R. at A1, D40 p.7.)

### B. Johnnie's Discharge from VIA

In the fall of 2007, Johnnie's behavior grew more serious. (R. at D40 p.7.) On September 13, 2007, Johnnie injured a VIA staff member after he pushed her across the room into the edge of an open door. (R. at C6, D40 p.7, E p.371-73.) A few months later, on

---

[9] An IEP addendum was issued on September 6, 2007 to address speech/language services and occupational therapy services, which were provided on a weekly basis. (R. at A1.) Johnnie is predominantly non-verbal and relies on a Dynavox communication output device and sign language to communicate. (R. at A1, E p.139, 162-63.)

[10] Testimony reveals that Johnnie had engaged in similar behavior at his previous placement, Tazewell Elementary School, and that this behavior had been disclosed to VIA prior to enrollment. (R. at E p.48-49.)

November 7, 2007, Johnnie chased after staff and head-butted one staff member in the jaw. (R. at C7, D40 p.7-8, E p.374-75; see R. at A5.) The next day the behavior continued, and Johnnie injured his head and face by repeatedly banging his head against walls, his desk, and other objects. (R. at C8, D40 p.8, E p.376; see R. at A5.) The Smiths attribute this decline in behavior to a temporal change in his schedule. (See R. at A15, B1, E p.63, 65.)

Following the incident on November 8, 2007, VIA directed the Smiths to keep Johnnie at home while they repaired his classroom. (R. at E p.68-69, 150.) The next day, Michael McKee called Mrs. Smith and recommended that the Smiths take Johnnie for an in-patient evaluation at an appropriate facility. (R. at D40 p.8, E p.150-51.) VIA's acting Director of Education, Rorie Hutter, called Randy Corpening, Director of Special Services for Greene County Schools, and advised him that VIA did not want Johnnie to return to school until they had a chance to review his program. (R. at D40 p.8, E p.226.)

The following Monday, November 12, 2007, Greene County called a meeting with VIA to determine how best to facilitate Johnnie's return to the program and insisted that he not remain out of school for more than ten (10) days. (R. at E p.226-27.) At Greene County's request, VIA prepared a list of additional support elements it would need to continue Johnnie's in-school placement, including a full time instructional assistant with Mandt[11] training who was capable of restraining Johnnie, Mandt training for one existing VIA staff member for back-up purposes, intensive behavior management and student supervision, and additional in-home training and support. (R. at D40 p.8, E p.56-57, 227, 230-31.) Greene County agreed to these requests and committed to providing the necessary funding for the additional assistant, at an estimated cost of

[11] Mandt is a system of de-escalation and, when needed, restraint, used at VIA to de-escalate students who become agitated and pose a risk of harm to themselves or others. (R. at D40 p.8 n.4, E p.388.)

$40,000 - $65,000. (R. at D40 p.8, E p.57, 231; see R. at B11, 12.) This would have brought Johnnie's teacher-to-student ratio to 2:1. According to Mr. Smith, no other school district had offered that kind of support before. (R. at E p.59.)

On November 13, 2007, Mr. Smith requested a functional behavioral assessment ("FBA")[12] of Johnnie. (R. at B8, D40 p.9.) Greene County complied with this request and arranged for an assessment by Diane Talarico-Cavanaugh, M.Ed., to take place on January 16, 2008.[13] (R. at A16, D40 p.9.) Randy Corpening engaged in discussions with VIA every day from November 13 through 16, 2007, in an effort to try to resolve the situation. (R. at E p.230-31.)

VIA provided Johnnie with in-home services beginning November 12, 2007, which included two instructors at the Smiths' home who worked with Johnnie from approximately 9:00 am to 2:00 pm. (R. at D40 p.9, E p.186-87; see R. at A12.) Notwithstanding Greene County's alternative placement suggestions, the Smiths declined to change Johnnie's IEP from in-school placement at VIA. (R. at E p.593-94.) Randy Corpening testified that:

> The parents did not want to amend the IEP to reflect homebound services in the interim period. Understanding their rational[e] for that; however, we were as an LEA still responsible, and in a quandary, and we could get neither party at that point to move in the right direction to get [Johnnie] back in school.

(R. at E p.227.) VIA's in-home instructors soon reported increasingly serious behavior from Johnnie, including incidents in which Johnnie threw himself over an upstairs balcony and charged a second-story window. (R. at A12, D40 p.9, E p.232-33.) At an IEP meeting on

---

[12] An FBA is defined as "a process to determine the underlying cause or functions of a child's behavior that impede the learning of the child with a disability or the learning of the child's peers." 8 Va. Admin. Code § 20-80-10.

[13] Greene County and the Smiths agreed that the FBA needed to take place in Johnnie's educational environment and thus could not take place until he was permitted to return to school at VIA. (R. at D36 ¶6.)

November 27, VIA represented it was actively searching for and interviewing candidates for the additional aide position, which was to be funded by Greene County. (R. at E p.60-61, 232.) At that point, Greene County was under the impression that Johnnie would be returning to VIA. (R. at E p.106.) Mr. Smith consented to continued implementation of Johnnie's IEP providing for placement at VIA without further changes. (R. at A1.)

VIA arranged for Johnnie to return to school for a half day on Thursday, November 29, 2007, for a classroom observation by VIA's consultant David Celiberti, Ph.D. (R. at A3, D36 Ex. B ¶7, E p.69.) In his report, Dr. Celiberti indicated some concern with respect to the level of accommodations needed to maintain Johnnie in a safe environment and the impact those measures had on the learning environment for other students. (R. at A3.) During the observation, he offered some suggestions to Johnnie's team about certain behavioral support strategies but noted that, although they might be helpful, "they are likely not sufficient. It is critical that there be a high level of consistency between home and school. I understand that there have been several serious behavior incidents that occurred in the context of home-based instruction." (R. at A3.) Dr. Celiberti voiced concern about the ability of VIA to sustain a high level of accommodation and environment modification on a long term basis. (R. at A3.) He opined that "the current placement may no longer be appropriate and that a carefully controlled functional assessment and medical evaluation is warranted for the team to make a fully informed decision about placement." (R. at A3.) Peter Gerhardtt, Ed.D., also recommended Johnnie receive an inpatient functional behavioral assessment for a clear determination of action and to rule out the need for any psychiatric or medical involvement. (R. at A4.)

On December 3, 2007, VIA's Board of Directors voted to discharge Johnnie from VIA and terminate homebound services effective December 4, 2007.[14] (R. at A2, D40 p.9; see also E p.197.) By letter addressed to Mr. and Mrs. Smith and copied to Greene County, VIA explained that Johnnie's behavior had reached a level that was life-threatening, and that it was concerned with its ability to ensure Johnnie's safety and the safety of other students and staff. (R. at A2.) VIA wrote:

> After a report from the staff and with assessments from Dr. Peter Gerhardt and Dr. David Celiberti, and after lengthy deliberation, the Board concluded that, at this time, [Johnnie's] need for support, accommodations and modifications exceed the capacity of VIA's program resources and facilities, both for school-based and home-bound services.

(R. at A2; see also E p.427.)[15] VIA offered to provide up to twenty hours of training for respite care workers supporting Johnnie in the home and would consider Johnnie's application for readmission to VIA in nine to twelve months. (R. at A2.)

### C. *Greene County's Actions Following Discharge from VIA*

Beginning December 4, 2007, Greene County worked with the Smiths to identify a suitable alternative placement for Johnnie. (R. at D40 p.10.) Immediately following Johnnie's discharge, Greene County offered to provide ten hours of in-home services with Peter Miller, a Greene County special education teacher with experience in autism, and to continue with speech and occupational therapy, until another placement for Johnnie could be found. (R. at E p.228,

---

[14] Neither Greene County nor Johnnie's parents were invited to attend this meeting (R. at E p.233-34; 294; see R. at B4), nor were they notified in advance that the Board would discuss discharging Johnnie. (R. at B4, 47, E p.70-72.) Randy Corpening testified that he learned on November 29, 2007 that the VIA Board planned to discuss whether VIA remained an appropriate placement. (R. at E p.233.)

[15] VIA instructors were allegedly concerned for their safety. By this time, Johnnie had grown into a five foot eight, 185-pound adolescent. (R. at D40 p.7, E p.218-19.)

579-80.) Randy Corpening testified that the Smiths declined to take advantage of those services, adding, "I have documentation from both the OT and the speech [therapists] that phone calls have not been returned or they've been asked not [to work with Johnnie] at this point." (R. at E p.228.) Peter Miller was "a little bit more persistent with the parents" (R. at E p.228) and according to Mrs. Smith, he came to the house four or five times to work with Johnnie. (R. at E p.191.) Randy Corpening testified, and Mrs. Smith acknowledged, that homebound services were made available notwithstanding the Smiths' failure to take advantage of them; the offer to provide such services remained on the table as of the day of the due process hearing. (R. at E p.193, 234.)

Johnnie's school materials were made available to him by VIA on December 11, 2007. (R. at B31.) On December 19, 2007, Johnnie's IEP team met to discuss options.[16] (R. at D36 Ex. B ¶ 9, D40 p.10.) The IEP team discussed other day placements, including options in Richmond and Harrisonburg, but none was within a reasonable commuting distance from the Smiths' home. (R. at D5, D36 p.7 n.6, Ex. B ¶9, D40 p.10, E p.235.) The Smiths provided Greene County with permission to exchange information with residential facilities to begin to determine availability. (R. at D36 Ex. B ¶ 9.) According to Randy Corpening, Greene County "did not turn down any option at that point. We through [sic] everything on the table and wanted to look at everything at that point, with the understanding that VIA was not going to accept him back." (R. at E p.227-28.) Greene County looked at every residential facility of which it was aware, promptly contacting Kennedy Krieger Institute in Baltimore, as well as Grafton School[17]

---

[16] Randy Corpening testified that "[t]he reason why there was such a lag [in scheduling the IEP meeting] is that Mr. [Smith] was in and out of town and having difficulty making an IEP meeting and that was the earliest that we could meet." (R. at E p.572.)

[17] The Smiths indicated some concern about placement at Grafton School, and Grafton ultimately did not accept Johnnie to its program. (R. at D36 Ex. B ¶ 11, E p.235-36, 247-48.) Kennedy

and Cumberland Hospital for Children and Adolescents ("Cumberland"), both with residential facilities near Richmond. (R. at D36 Ex. B ¶ 9, 11, E p.572.)

Greene County received notice of the Smiths' due process complaint[18] on December 26, 2007. (R. at D36 Ex. B ¶ 10, D40 p.2, 10.) Hearing Officer Hooe ordered that Johnnie be granted stay-put placement at VIA during the pendency of the due process proceedings, pursuant to 20 U.S.C. § 1415(j). Greene County arranged for transportation to facilitate Johnnie's return to VIA (R. at D36 Ex. B ¶ 12), and Johnnie began in-school programming again on January 8, 2008. (R. at A18, E p.188-89, 213.) A number of modifications were instituted upon Johnnie's return to VIA. Six staff members were assigned to his instruction and supervision. (R. at E p.329, 384.) Exterior doors were blocked, bookshelves were removed from his room, other classrooms were equipped with door stops, and instructors were reminded of crisis intervention procedures. (R. at E p.329-30.)

Randy Corpening and Justin Malone, Coordinator of Special Services for Greene County, conducted unannounced visits at VIA to monitor Johnnie's placement. (R. at D36 Ex. B ¶ 14, E p.86, 217.) On January 15, 2008, an incident report was filed after Johnnie engaged in further self-injurious behavior that included banging his head into drywall. (R. at A19, C11, E p.377-79, 382-83.) Diane Talarico-Cavanaugh conducted an FBA on January 16, 2008. (R. at A16.) In the FBA report, Ms. Talarico-Cavanaugh questioned the appropriateness of VIA's consequence-based teaching strategies for Johnnie. (R. at A16.) She recommended that VIA immediately

---

Krieger did not have bed for Johnnie at the time and said it could be up to four months before a bed became available. (R. at E p.181-82, 237, 573-74, 577.)

[18] Although the Smiths named Greene County as a respondent, the specific relief they requested was against VIA. (R. at D1, 40 p.2-4 n.1.) Mr. Smith made clear at the outset of the administrative hearing on February 28, 2008 that his claim is that VIA failed to provide Johnnie FAPE. (R. at E p.26-28.)

discontinue the response cost procedure by which Johnnie would lose a previously earned sticker when he engaged in aggressive behavior. (R. at A16.)

On January 18, 2008, VIA exercised a thirty-day written notice clause in its contract, notifying Greene County that it was terminating the Principal Agreement[19] effective February 17, 2008. (R. at A11, D40 p.11.) VIA also terminated its Purchase of Services Order pertaining to Johnnie, giving Greene County ten (10) days written notice pursuant to Paragraphs 4.E and 14 of the Principal Agreement. (R. at A10, 11.)

On January 24, 2008, an incident report was filed after Johnnie forced his way into other classrooms, which led to the evacuation of other students from the building. (R. at A20, C12, 13, E p.384-85.) Concerned about the way VIA was treating Johnnie, the Smiths decided not to return Johnnie to school after January 24, 2008. (R. at E p.92-94, 178-80, 190-91; see R. at D36 Ex. B ¶ 21.) VIA stopped providing stay-put services on January 28, 2008, upon the advice of counsel. (R. at D40 p.10, E p.338-39.)

The IEP team had convened several meetings to address services for Johnnie, but Mr. and Mrs. Smith would not consent to changing Johnnie's IEP placement from VIA. (R. at D40 p.10, 21.) Nevertheless, Greene County representatives toured Cumberland, a potential residential placement that Randy Corpening thought might be appropriate. (R. at E p.574-75.) Given the conclusions set forth in the FBA report, Johnnie's IEP team decided at a February 8, 2008 meeting that he needed a temporary evaluative placement at a residential facility to attempt to stabilize his behavior and provide information for development of a long-term IEP. (R. at D36 Ex. B ¶ 23, D40 p.10.)[20] As of the February 8, 2008 IEP meeting, Cumberland had admitted

---

[19]  References to the Principal Agreement are to the 2007-08 Principal Agreement unless otherwise specified.

[20]  The parents agreed Johnnie needed an evaluation. (R. at E p.363.)

Johnnie and a bed was immediately available. (R. at E p.239, 575.) However, the Smiths refused to consent to this placement until they had reviewed the Kennedy Krieger Institute. (R. at D36 Ex. B ¶ 23, E p.575.) Johnnie's bed at Cumberland was lost by the end of February. (R. at E p.575-77.) On the first day of the due process hearing, February 28, 2008, Randy Corpening testified that he was concerned about Johnnie and had urged the Smiths to meet to discuss placement options as soon as possible, but "the parents have answered that he needs – until his calendar is – he would let me know when he was available." (R. at E p. 240-41.)

According to the affidavit of Randy Corpening (Docket #19 ¶ 10), the Smiths did not consent to placement at Cumberland until March 17, 2008, after the conclusion of the due process hearing. Once a new bed became available, Johnnie began his placement at Cumberland on March 24, 2008, pursuant to IEP addenda dated March 17, 2008 and April 2, 2008. (Docket #19, ¶ 12-13.)

## IV. IDEA ANALYSIS

### A. *Standard of review*

A summary judgment motion is "the most pragmatic procedural mechanism for resolving IDEA cases." Hanson ex rel. Hanson v. Smith, 212 F. Supp. 2d 474, 481 (D. Md. 2002); see also DeLullo v. Jefferson Co. Bd. of Educ., 71 F. Supp. 2d 554, 559-60 (N.D. W. Va. 1998), aff'd, 194 F.3d 1304 (4th Cir. 1999) (per curiam) (allowing a district court reviewing a state administrative decision under the IDEA to grant summary judgment based upon the administrative record). Generally, summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). In the IDEA

context, however, a motion for summary judgment challenging an administrative ruling "may more aptly be described … as a motion for summary adjudication." Cone v. Randolph Co. Sch. Bd. of Educ., No. 1:06cv579, 2009 WL 3064723, at *4 (M.D.N.C. Sept. 22, 2009) (quoting Hanson ex rel. Hanson, 212 F. Supp. 2d at 480); see also J.P. ex rel. E.P. v. Ripon Unified Sch. Dist., No. 2:07cv02084, 2009 WL 1034993, at *2 (E.D. Cal. Apr. 15, 2009) ("Though not a true motion for summary judgment, the appeal of an IDEA-based due process hearing decision is properly styled and presented by the parties in a summary judgment format."); Fitzgerald v. Fairfax Co. Sch. Bd., 556 F. Supp. 2d 543, 550 (E.D. Va. 2008) ("It is well-settled and undisputed by the parties that a district court reviewing a state administrative decision under the IDEA may grant a motion for judgment on the administrative record."). In IDEA cases, the existence of a disputed issue of material fact will not defeat a motion for summary judgment. J.S. ex rel. Y.S. v. North Colonie Cent. Sch. Dist., 586 F. Supp. 2d 74, 81 (N.D.N.Y. 2008) (quoting J.R. v. Bd. of Educ., 345 F. Supp. 2d 386, 394 (S.D.N.Y. 2004)); see also Lillbask ex rel. Mauclaire v. Conn. Dep't of Educ., 397 F.3d 77, 83 n.3 (2d Cir. 2005) ("[A] motion for summary judgment in an IDEA case often triggers more than an inquiry into possible disputed issues of fact. Rather, the motion serves as a 'pragmatic procedural mechanism' for reviewing a state's compliance with the procedures set forth in IDEA and determining whether the challenged IEP is reasonably calculated to enable the child to receive educational benefits.").

Indeed, federal courts are charged by statute with conducting an independent judicial review of the administrative decision and considering the administrative record as well as additional evidence at the request of a party; courts must base their decisions on a preponderance of the evidence. 20 U.S.C. § 1415(i)(2)(C). However, the requirement that the court base its decision on the preponderance of the evidence "is by no means an invitation to the courts to

substitute their own notions of sound educational policy for those of the school authorities which they review." Bd. of Educ. v. Rowley, 458 U.S. 176, 206 (1982); accord DeLullo, 71 F. Supp. 2d at 559. "The primary responsibility for formulating the education to be accorded a handicapped child, and for choosing the educational method most suitable to the child's needs, was left by the Act to state and local educational agencies in cooperation with the parents or guardian of the child." Rowley, 458 U.S. at 207. The judicial review proceedings under the IDEA have been described as "something short of a trial de novo." Town of Burlington v. Dep't of Educ., 736 F.2d 773, 790 (1st Cir. 1984); see also Damian J. v. Sch. Dist., No. 06-3866, 2008 WL 191176, at *2 (E.D. Pa. Jan. 22, 2008) ("The 'due weight' requirement has been described as 'modified de novo' review, and is the appropriate standard of review of administrative hearing decisions in IDEA cases."). The ultimate question is whether a proposed IEP is adequate and appropriate for a particular child at a given point in time. Town of Burlington, 736 F.2d at 788.

In conducting their review, courts must give due weight to the state administrative proceeding. Rowley, 458 U.S. at 206. In determining the due weight to be given to an administrative decision, courts should "examine the way in which the state administrative authorities have arrived at their administrative decision and the methods employed." Doyle v. Arlington Co. Sch. Bd., 953 F.2d 100, 105 (4th Cir. 1991). The due process hearing officer's findings of fact are entitled to be considered prima facie correct. Id. at 105; DeLullo, 71 F. Supp. 2d at 559. Otherwise, the due process proceedings would be reduced "to a mere dress rehearsal by allowing appellants to transform the Act's judicial review mechanism into an unrestricted trial de novo." Springer v. Fairfax Co. Sch. Bd., 134 F.3d 659, 667 (4th Cir. 1998). If the district court declines to follow the hearing officer's factual findings, it is required to explain why it does not. Doyle, 953 F.2d at 105; DeLullo, 71 F. Supp. 2d at 559.

It is well-established that the party challenging the decision of a due process hearing officer bears the burden of proof. Barnett ex rel. Barnett v. Fairfax Co. Sch. Bd., 927 F.2d 146, 152 (4th Cir. 1991); Tice ex rel. Tice v. Botetourt Co. Sch. Bd., 908 F.2d 1200, 1206 n.5 (4th Cir. 1990); Town of Burlington, 736 F.2d at 794; Fitzgerald, 556 F. Supp. 2d at 550. Thus, in this case, the burden of proof lies with the Smiths.

**B.** *Discussion*

The issue before the court is whether Greene County denied Johnnie FAPE after he was discharged from VIA, the private school in which he was placed pursuant to his 2007-08 IEP. In reviewing the due process hearing officer's decision, the court must determine: 1) whether the state complied with IDEA procedures, and 2) whether the child's IEP is reasonably calculated to enable him to receive educational benefits. Bd. of Educ. v. Rowley, 458 U.S. 176, 206-07 (1982). "There is no bright line distinguishing all the 'procedural' requirements of the IDEA from its 'substantive' requirements." A.K. ex rel. J.K. v. Alexandria City Sch. Bd., 484 F.3d 672, 684 (4th Cir. 2007), reh'g denied, 497 F.3d 409 (4th Cir. 2007), cert. denied, 128 S. Ct. 1123 (2008). Substantive violations of the IDEA result in the denial of FAPE, whereas procedural violations do not necessarily deny a child FAPE. Id. at 684; Fitzgerald v. Fairfax Co. Sch. Bd., 556 F. Supp. 2d 543, 551 (E.D. Va. 2008). Giving due weight to the administrative findings, the undersigned finds by a preponderance of the evidence that Greene County did not violate either the procedural or substantive requirements of the IDEA in this case.

1.     There Were No Procedural Violations of the IDEA.

The court's inquiry begins with an examination of Greene County's procedural compliance with the Act. See Rowley, 458 U.S. at 206-07. Plaintiff has not alleged specifically that Greene County violated a procedural requirement of the IDEA. On the whole, the claims

raised in Plaintiff's due process complaint are directed towards VIA, not Greene County. (R. at D1, 40 p. 2-4 n.1.) Indeed, Mr. Smith testified at the due process hearing that his complaint was that VIA denied Johnnie FAPE, stating that Greene County was involved merely as a necessary party to the due process proceeding, and asking that any order issued by the hearing officer be directed at VIA. (R. at E p.27-28, 30, 294, 559.)

Only one request for relief in Plaintiff's due process complaint – the request for a functional behavioral assessment of the parents' choosing – could be construed as a claim that Greene County failed to comply with the procedural requirements of the IDEA.[21] Greene County arranged for Diane Talarico-Cavanaugh to conduct an FBA on January 16, 2008, pursuant to the Smiths' request. In their due process complaint filed on December 21, 2007, and in an email to Randy Corpening on January 23, 2008 (R. at B29), the Smiths requested a second evaluation. To the extent the Smiths disagree with the January 16, 2008 assessment and seek an independent educational evaluation of Johnnie pursuant to 34 C.F.R. § 300.502(b),[22] they are entitled to obtain an independent evaluation at their own expense. Officer Vaden found that a

---

[21] Any additional claims of procedural violations on the part of Greene County that may have been raised in Plaintiff's Amended Complaint are barred, as they were not presented at the due process hearing. Snyder ex rel. Snyder v. Montgomery Co. Pub. Schs., No. 2008-1757, 2009 WL 3246579, at *6 (D. Md. Sept. 29, 2009) ("An allegation that a school district violated the IDEA may only be considered by a reviewing court if that issue was first presented and preserved before the administrative law judge at the administrative hearing."). The allegation (be it procedural or substantive) raised in Plaintiff's Motion for Partial Summary Judgment for Denial of FAPE that Greene County failed to implement Johnnie's IEP is addressed infra, in § IV.B.2.

[22] If a parent requests an independent educational evaluation pursuant to 34 C.F.R. § 300.502(b)(2), the public agency must either (1) file a due process complaint and request a hearing to show that its evaluation was appropriate, or (2) provide an independent evaluation at public expense. Accord 8 Va. Admin. Code § 20-80-70(B). However, as the Smiths requested an evaluation before the FBA scheduled by Greene County was conducted on January 16, 2008, parents do not appear to have been invoking their rights to an independent educational evaluation under 34 C.F.R. § 300.502(b)(2).

second evaluation at public expense was not appropriate under the circumstances (R. at D40 p.22), and the undersigned concurs. See 8 Va. Admin. Code § 20-80-70(B) (if the final decision of the hearing officer is that the LEA's evaluation is appropriate, the parents are entitled to an independent educational evaluation, but not at public expense). As the parents' request for an additional evaluation was brought before the hearing officer in their due process complaint, any failure on Greene County's part to raise the issue in a separate due process complaint did not constitute denial of FAPE. See Gadsby ex rel. Gadsby v. Grasmick, 109 F.3d 940, 956 (4th Cir. 1997) (holding procedural violations must interfere with the provision of FAPE to support a finding that an agency failed to provide FAPE); see also Fitzgerald v. Fairfax Co. Sch. Bd., 556 F. Supp. 2d 543, 551 (E.D. Va. 2008) ("[I]t is clear that a procedural violation of the IDEA is not alone sufficient to show a school failed to provide a child with a FAPE.").

### 2. There Were No Substantive Violations of the IDEA.

The crux of Plaintiff's IDEA claim is his allegation that he was denied FAPE following his suspension from VIA on November 8, 2007.[23] The court has limited its inquiry in this IDEA analysis to the time period between November 8, 2007, the date of Johnnie's suspension from VIA, and March 25, 2008, the date Officer Vaden issued his opinion in this matter. Plaintiff makes no claim with respect to the appropriateness of Johnnie's August 28, 2007 IEP or his education at VIA prior to November 8, 2007. As to the terminal date, the court may not reach any claim following March 25, 2008, as there has been no administrative review of Johnnie's

---

[23] It is worth reiterating that the issue before the court is whether Greene County denied Johnnie FAPE, not whether Johnnie was denied FAPE by VIA. In a Report and Recommendation issued April 22, 2009, the undersigned recommended that Plaintiff's IDEA claim against VIA be dismissed. The Report and Recommendation was adopted by the district court without objection from Plaintiff. (See Docket #87 & 88.)

placement at Cumberland or of anything that has transpired since March 25, 2008.[24] See M.M. ex rel. D.M. v. Sch. Dist., 303 F.3d 523, 536 (4th Cir. 2002) ("When parents of a disabled child challenge multiple IEPs in court, they must have exhausted their administrative remedies for *each academic year* in which an IEP is challenged." (emphasis in original)). After careful review of the administrative record, the undersigned concludes that a preponderance of the evidence supports Officer Vaden's finding that Greene County provided Johnnie FAPE during the relevant time period.

*i. November 8 – December 3, 2007.*

Greene County had no prior warning of Johnnie's suspension from VIA's in-school programming after the incident that occurred on Thursday, November 8, 2007. Nevertheless, Greene County took immediate action, meeting with VIA the following Monday to determine how to facilitate Johnnie's return to the program. Randy Corpening engaged in daily discussions with VIA in an attempt to resolve the situation. During this period, VIA provided Johnnie with homebound services[25] from November 8th until his discharge on December 3, 2007.

In the week following Johnnie's suspension, VIA gave Greene County a list of additional support elements needed to maintain Johnnie's in-school placement, including a full-time instructional assistant with Mandt training who was capable of restraining Johnnie. Greene County agreed to fund the employment of this additional staff member at an estimated cost of $40,000 - $65,000, bringing Johnnie's teacher-to-student ratio to 2:1. VIA staff reported to Mr.

---

[24] (See Docket #87.)

[25] The Virginia Administrative Code provides that home-based instruction is an appropriate placement in certain circumstances. See 8 Va. Admin. Code §§ 20-80-64(C)(2) ("Home-based instruction shall be made available to children whose IEPs require the delivery of services in the home or other agreed-upon setting"), 20-80-64(C)(3) (providing that homebound instruction be made available to students who are confined for periods that prevent normal school attendance upon certification of need by a physician or psychologist).

Smith that "no other school district had ever offered that kind of support to VIA before; that being able to provide an additional aide at an additional cost to be paid by the school district was unprecedented. . . ." (R. at E p.59.) Additionally, Michael McKee testified that Johnnie's IEP team never denied any specific request for accommodations or resources made by VIA. (R. at E p.413-14.) Greene County also agreed to conduct a functional behavioral assessment of Johnnie to determine the origin of his behavior and arranged for Diane Talarico-Cavanaugh, M.Ed. to assess Johnnie at VIA on January 16, 2008.

After Johnnie was suspended, the Smiths insisted that he remain at VIA and would not agree to change his IEP. At an IEP meeting on November 27, 2007, Mr. Smith consented to continued implementation of Johnnie's existing IEP, despite the fact that VIA had not agreed to readmit Johnnie. Based on VIA's representations that candidates for the additional aide position were being interviewed, Greene County believed progress was being made towards Johnnie's return to the program and continued to work to that effect. Greene County made every reasonable effort to facilitate Johnnie's return to VIA and to continue to implement Johnnie's IEP. In the meantime, Johnnie received educational homebound services every VIA school day from November 12 – December 3, 2007.[26]

*ii. December 4 – December 21, 2007.*

VIA did not give Greene County advance notice that Johnnie would be discharged from its program on December 3, 2007. Its decision was unilateral; neither Greene County nor Johnnie's IEP team had any input. Alexander Moore, President of VIA's Board of Directors,

---

[26] VIA was closed for the Thanksgiving holiday from November 21-23, 2007, so no services were lost during this time. (Docket #123, Ex. 2.) Therefore, the only day Johnnie was without educational services during this period was Friday, November 9, 2007.

testified at the due process hearing that VIA's decision to discharge Johnnie was not based in any way on Greene County's failure to provide accommodations or resources. (R. at E p.459.)

After Johnnie was discharged, VIA made Johnnie's school materials available for home-based instruction, and Greene County immediately offered to provide Johnnie with homebound services until another placement could be found. The Smiths refused Greene County's offer of interim homebound services.

The Smiths were not available to meet with the IEP team to discuss alternative placements for over two weeks after Johnnie's discharge.[27] Therefore, Greene County and the IEP team could not meet to revise Johnnie's IEP, see 8 Va. Admin. Code § 20-80-62(D)(1)(b) (LEA shall take steps to ensure one or both parents of a disabled child are present at each IEP meeting and are afforded the opportunity to participate, including scheduling the meeting at a mutually agreed on time and place), or explore alternative placement options, as the Smiths' permission was required in order to exchange information with potential residential facilities. (R. at D36 Ex. B ¶ 9.)

Although Johnnie did not receive educational services from December 4 - 21, 2007, Greene County cannot be held responsible for the failure to implement Johnnie's IEP during this period of time. Cf. M.M. ex rel. D.M. v. Sch. Dist., 303 F.3d 523, 535 (4th Cir. 2002) (finding school district was not liable for failure to have IEP completed and signed when that failure was result of parents' lack of cooperation); Tracy v. Beaufort Co. Bd. of Educ., 335 F. Supp. 2d 675, 691-92 (D.S.C. 2004) (finding school district not liable when parents refused to cooperate or participate in development of IEP).

---

[27] Regardless of who was responsible for this delay, the timing of this meeting was not so egregious as to constitute a violation of Johnnie's procedural rights under the IDEA. See Bd. of Educ. v. Brett Y., 155 F.3d 557 (4th Cir. 1998) (unpublished table opinion) (finding two month delay in meeting to finalize IEP and placement decision did not violate the IDEA).

*iii. December 22, 2007 – January 24, 2008.*

VIA was closed for the holidays between December 22, 2007[28] and January 1, 2008, so

Johnnie lost no educational services during this time. (Docket #123, Ex. 2.) On January 8, 2008,

Johnnie returned to VIA pursuant to Officer Hooe's stay-put ruling, and Greene County arranged

for his transportation back to school. VIA made a number of modifications to facilitate

Johnnie's return, assigning six staff members to his instruction and supervision, removing

bookshelves from his classroom, and blocking doors to prevent him from running away from

staff. Randy Corpening and Justin Malone made four unannounced visits to VIA on behalf of

Greene County to ensure Johnnie's IEP was being implemented. Johnnie remained at VIA

through January 24, 2008, when his parents decided not to send him back to school.

Johnnie did not receive any instruction for four school days during this time period -

January 2, 3, 4 and 7th. The Smiths would not accept homebound services, and Greene County

could not have placed Johnnie elsewhere during that time, as the Smiths had invoked the IDEA's

stay-put protection pursuant to 20 U.S.C. § 1415(j) after filing a due process complaint on

December 21, 2007. Section 1415(j) is prohibitory in nature, in that a school board cannot

change a child's then-current placement regardless of its availability. Wagner v. Bd. of Educ.,

335 F.3d 297, 301-02 (4th Cir. 2003). As explained in Wagner, the IDEA:

> guarantees an injunction that prohibits a school board from
> removing the child from his or her current placement during the
> pendency of the proceedings. . . . Thus, when presented with an
> application for section 1415(j) relief, a district court should simply
> determine the child's then-current educational placement and enter
> an order maintaining the child in that placement.

---

[28] VIA officially closed for the holidays on December 24th; however, December 22 and 23,
2007 fell on the preceding Saturday and Sunday.

335 F.3d at 301. Once stay-put was invoked, Greene County could not have changed Johnnie's

placement from VIA[29] without the Smiths' consent. Greene County's hands were tied with

respect to its ability to implement or revise Johnnie's IEP.

<em>iv. January 25 – March 25, 2008.</em>

The Smiths decided not to send Johnnie back to VIA after January 24, 2008. Greene

County played no role in that decision. Again, the Smiths refused Greene County's offer of

homebound services, including instruction from Peter Miller, a Greene County special education

teacher,[30] as well as occupational and speech therapy. Mrs. Smith testified that Greene County

offered to provide this instruction after January 24, 2008, but the Smiths only took advantage of

it when Johnnie was "available" to participate. (R. at E p.192-93.) Mr. Miller was persistent in

asking the Smiths to allow him to instruct Johnnie, and he visited the Smiths' home to work with

Johnnie on four or five occasions.

As the stay-put ruling was still in full force and effect as of January 25, 2008, Greene

County could not have changed Johnnie's placement absent his parents' consent. See 20 U.S.C.

§ 1415(j). An IEP meeting was held on February 8, 2008 to identify and evaluate potential

---

[29] The Fourth Circuit held in A.W. ex rel. Wilson v. Fairfax Co. Sch. Bd., 372 F.3d 674, 682-83 (4th Cir. 2004), that the term "educational placement" as referenced in 20 U.S.C. § 1415(j) means the environment in which educational services are provided, not necessarily the location to which the student is assigned. See 34 C.F.R. § 300.115 (continuum of alternative placements includes instruction in regular classes, special classes, special schools, home instruction, and instruction in hospitals and institutions); accord 8 Va. Admin. Code § 20-80-64. In this case, VIA was the only day placement in the area, so VIA was the appropriate stay-put placement. See 8 Va. Admin. Code § 20-80-64(C)(1)(b)(3) (placement to be as close as possible to child's home).

[30] At the administrative hearing, Mr. Smith dismissed this offer of services, referring to Peter Miller as a "regular teacher" who was sent in an attempt to provide Johnnie "some services, since he's otherwise had none." (R. at E p.198.) Although the IDEA "does not require special education service providers to have every conceivable credential relevant to every child's disability," DeLullo v. Jefferson Co. Bd. of Educ., 71 F. Supp. 2d 554, 559 (N.D. W. Va. 1998), aff'd, 194 F.3d 1304 (4th Cir. 1999) (citing Hartmann v. Loudon Co. Bd. of Educ., 118 F.3d 996, 1001 (4th Cir. 1997)), Mr. Miller did, in fact, have experience with autism. (R. at E p.228.)

residential placements for Johnnie, as research revealed that no appropriate day programs were available. The IEP team agreed that a residential placement would be appropriate, and Cumberland accepted Johnnie and had a bed available for him at the time. However, the Smiths were unwilling to consent to placement at Cumberland. Instead, Johnnie remained placed at VIA, a school that was functionally unavailable, Wagner, 335 F.3d at 300-01, without any consistent homebound educational services. Eventually, the Smiths did consent to placement at Cumberland on March 17, 2008, and Johnnie began his placement there within a reasonable period of time. See Bd. of Educ. v. Brett Y., 155 F.3d 557 (4th Cir. 1998) (unpublished table opinion).

### v. FAPE has been provided at all times.

Certainly, Johnnie's 2007-08 IEP as originally written was not implemented after November 8, 2007, save for the period of time Johnnie returned to VIA from January 8 – 24, 2008. On this record, however, the undersigned cannot say that responsibility lies with Greene County. A preponderance of the evidence supports Officer Vaden's assessment that Greene County did not deny Johnnie FAPE.

Plaintiff argues that Johnnie was not instructed in a VIA classroom during the relevant time period pursuant to the terms of his IEP and therefore did not receive FAPE. (Plaintiff's Motion for Partial Summary Judgment for Denial of FAPE (Docket #160), hereinafter "Pl.'s IDEA Br." at 5.) However, Plaintiff fails to recognize the fact that VIA made itself functionally unavailable to Johnnie as a placement, through no fault of Greene County. See Wagner v. Bd. of Educ., 335 F.3d 297, 300-01 (4th Cir. 2003) (finding private school in which student was placed pursuant to IEP was functionally unavailable when it stopped providing services through no fault

of the school district). Placement at VIA pursuant to the 2007-08 IEP simply was not possible after Johnnie was discharged on December 3, 2007.

Plaintiff suggests that Greene County could have – and should have – forced VIA to remain available as a placement. This is simply not the case. Greene County had no way of forcing VIA to readmit Johnnie, aside from bringing a breach of contract action with little likelihood of success.[31] See infra § V.C. Greene County's only recourse as the LEA responsible for IDEA compliance was to find an alternative placement and revise Johnnie's IEP. See 8 Va. Admin. Code § 20-80-66(A)(1) (responsibility for IDEA compliance lies with the local school division); 8 Va. Admin. Code § 20-80-90(A) ("The local educational agency shall ensure that the rights and protections under this chapter are given to children with disabilities for whom it is responsible, including children placed in private schools."); see also 20 U.S.C. § 1414(d)(4)(A) (LEA revises IEP as appropriate).

In that vein, Plaintiff argues that Greene County never found an appropriate, alternative placement for Johnnie during the relevant time period. (See Pl.'s IDEA Br. at 5.) This argument also is meritless. Beginning December 4, 2007, Greene County sought to provide in-home services, which the parents declined to accept. An IEP meeting could not be scheduled until December 19, 2007, due to Mr. Smith's unavailability. No other day placements were available, and Greene County obtained the Smiths' permission to evaluate residential options, which it did. After filing their due process complaint, the Smiths invoked stay-put placement, completely tying Greene County's hands with respect to revising Johnnie's IEP. Without the parents' consent, Greene County *could not* have changed Johnnie's placement from VIA during the stay-put period. See Wagner, 335 F.3d at 303 ("When presented with an application for a 'stay put'

---

[31] Even if Greene County had brought a breach of contract action against VIA, Johnnie still would have been out educational services during the pendency of the proceedings.

injunction, the district court should have entered an order maintaining the child in the then-current education placement, whatever the status of that placement."). The undersigned concurs with Officer Vaden's finding that at all times, the Smiths would not consent to a change in placement from VIA.[32] (R. at D40 p.21.)

While the IDEA does not require parental consent for revision of an IEP outside of the stay-put period, "the core of the statute . . . is the cooperative process that it establishes between parents and schools." Schaffer ex rel. Schaffer v. Weast, 546 U.S. 49, 53 (2005); accord Fitzgerald v. Fairfax Co. Sch. Bd., 556 F. Supp. 2d 543, 551 (E.D. Va. 2008); see also 20 U.S.C. § 1414(e) (LEA shall ensure that the parents of each child are members of any group that makes decision on the educational placement of their child). "Congress certainly intended parents to be involved in the decisions regarding the education of their disabled child; nevertheless, this participation does not rise to the level of parental consent or a parental veto power absent an explicit statement by Congress." Fitzgerald, 556 F. Supp. 2d at 551; see also A.W. ex rel. Wilson v. Fairfax Co. Sch. Bd., 372 F.3d 674, 683 n.10 (4th Cir. 2004) ("[T]he right conferred by the IDEA on parents to participate in the formulation of their child's IEP does not constitute a veto power over the IEP team's decisions."). Either parents or school districts can invoke the procedural safeguards set forth in 20 U.S.C. § 1415 if, for example, they cannot agree on a proposed change to an IEP. See Schaffer ex rel. Schaffer, 546 U.S. at 53. Thus, in this case,

---

[32] It is clear from the record that the Smiths felt that VIA was the appropriate placement for Johnnie. In fact, as of the first day of the due process hearing, February 28, 2008, Mr. Smith stated that he would be asking that Officer Vaden "order that [Johnnie] continue to be educated at the Virginia Institute of Autism, despite the denial of FAPE by VIA. We will ask that the Virginia Institute of Autism, in providing FAPE to [Johnnie] pursuant to his IEP, provide him appropriate accommodations, the need for which we'll develop in the testimony that you'll hear both today and on [March] 10th." (R. at E p.28.) By March 10, 2008, the Smiths had changed position, asserting that "we are not asking for an order to return [Johnnie] to VIA, and we are not asking for you to address [Johnnie's] current placement." (R. at E p.367.)

Greene County could have sought a due process hearing when the Smiths refused to consent to a change in placement from VIA prior and subsequent to the stay-put period.

However, its failure to do so did not result in a denial of FAPE. After the stay-put order was reversed by Officer Vaden on February 15, 2008, due process procedures were already pending in this case, and on March 17, 2008 the parents consented to a change in placement. In the period of time prior to the stay-put order, Greene County reasonably expected Johnnie to return to VIA after his initial suspension, and parents consented to his continued placement at VIA on November 27, 2007. Following Johnnie's discharge from VIA in December, an IEP meeting was delayed over two weeks due to the Smiths' unavailability. See supra § IV.B.2.ii. Soon thereafter, a due process complaint was filed, stay-put was ordered and placement could not be changed. 20 U.S.C. § 1415(j).

On brief, Plaintiff claims:

> [Greene County] has consistently blamed Parents for its failure to find an adequate substitute for VIA. Parents are not responsible for the fact that there is no other day program for children with autism in Greene or Albemarle Counties or in the City of Charlottesville. Parents cannot be blamed for not changing Johnnie's IEP merely to let VIA off the hook without providing Johnnie with a substitute appropriate placement.

(Pl.'s IDEA Br. at 5.) However, it is clear from the record that the Smiths failed to cooperate with Greene County's efforts to provide FAPE once VIA became functionally unavailable. Cf. Cone v. Randolph Co. Sch. Bd. of Educ., No. 1:06cv579, 2009 WL 3064723, at *7 (M.D.N.C. Sept. 22, 2009) ("When parents refuse to consent to [special education and related services], the school district no longer has an obligation to provide FAPE to the child."). The IDEA does not require the state to provide an optimal education, only a FAPE. M.M. ex rel. D.M. v. Sch. Dist., 303 F.3d 523, 535 (4th Cir. 2005) (quoting Bd. of Educ. v. Rowley, 458 U.S. 176, 192 (1982)).

"[O]nce FAPE is offered, the school district need not offer additional educational services." Id. at 526-27 (quoting Matthews v. Davis, 742 F.2d 825, 830 (4th Cir. 1984)). The state need not furnish "every special service necessary to maximize each handicapped child's potential." M.M. ex rel. D.M., 303 F.3d at 527 (quoting Hartmann v. Loudoun Co. Bd. of Educ., 118 F.3d 996, 1001 (4th Cir. 1997)). Rather, the state is charged with providing services "sufficient to confer some educational benefit upon the handicapped child." Id. at 527 (quoting Hartmann, 118 F.3d at 1001).

At the summary judgment hearing, Plaintiff argued that Greene County's failure to provide FAPE is apparent by virtue of the regression in Johnnie's behavior following his discharge from VIA. While evidence of actual progress may be relevant in determining whether an IEP was reasonably calculated to confer educational benefit, it is not dispositive with respect to whether a child receives FAPE. M.S. ex rel. Simchick v. Fairfax Co. Sch. Bd., 553 F.3d 315, 327 (4th Cir. 2009); see also In re Conklin v. Anne Arundel Co. Bd. of Educ., 946 F.2d 306, 313 (4th Cir. 1991). Plaintiff has offered no evidence to support its assertion that Johnnie's behavior has regressed since November, 2007 and that regression is a result of Greene County's failure to provide FAPE. Indeed, it is clear from the record that Greene County made great efforts to provide Johnnie with a suitable education. It placed him at VIA at public expense pursuant to an appropriate IEP; Johnnie's discharge from VIA was not something Greene County took lightly. Greene County was, at all times, ready and willing to provide educational services to Johnnie and/or find him an alternative placement. See M.M. ex rel. D.M., 303 F.3d at 526-27 (stating school district need not offer additional educational services once FAPE is offered).

After two days of testimony from six witnesses and a review of 119 exhibits, Officer Vaden concluded in a thorough twenty-three page opinion that Greene County was not deficient

in the educational services it offered Johnnie. A preponderance of the evidence supports this finding and his conclusion is persuasive. Plaintiff simply has not met his burden of proving that Greene County failed to provide Johnnie FAPE in this case.

Because there was no denial of FAPE by Greene County, Johnnie is not entitled to compensatory education. G. ex rel. SSGT. R.G. v. Fort Bragg Dependent Sch., 324 F.3d 240, 254 (4th Cir. 2003) ("Compensatory education involves discretionary, prospective, injunctive relief crafted by a court to remedy what might be termed an educational deficit created by an educational agency's failure over a given period of time to provide a FAPE to a student.").

To this extent, the undersigned **RECOMMENDS** that Greene County's Motion for Summary Judgment (Docket #124) be **GRANTED** and that Plaintiff's Motion for Partial Summary Judgment for Denial of a Free and Appropriate Public Education to Plaintiff Johnnie Smith (Docket #160) be **DENIED**.

## V. BREACH OF CONTRACT CLAIM

### A. *Factual Background*

Prior to Johnnie's enrollment at VIA, Greene County CPMT and VIA entered into a Principal Agreement on July 1, 2005, through which Greene County purchased educational services for a student unrelated to this action.[33] (Docket #127, Ex. C ¶ 11, Ex. D.) The 2005 Principal Agreement is a generic form services agreement available to agencies of the Commonwealth that contract with private entities to provide services to at-risk youth pursuant to the Virginia Comprehensive Services Act.[34] (Docket #127 ¶ 7.) Signatories to the contract

---

[33] This Greene County student attended VIA from 1999 through January, 2006. (Docket #127, Ex. C ¶ 11.) The 2005 Principal Agreement had a one year term and expired on June 30, 2006.

[34] The Comprehensive Services Act (CSA) was enacted to create a collaborative system of services and funding for troubled and at-risk youths and their families. Va. Code Ann. § 2.2-5200, et seq. The CSA is designed to identify young children and their families who are at risk

include Michael McKee on behalf of VIA; James E. Howard, Greene County CPMT chair; and Amanda D. Long, CSA Coordinator. (Docket #127, Ex. D.) Neither VIA nor Greene County CPMT drafted this agreement or made any substantive changes to it. (Docket #127 ¶ 8.) Plaintiff was not a party to this contract. (Docket #127 ¶¶ 9-11, Ex. D.)

Johnnie enrolled at VIA in April, 2006. After the 2005 Principal Agreement expired in June, 2006, the parties did not execute a Principal Agreement for the 2006-07 school year, despite the fact that Johnnie remained enrolled at VIA. (Docket #127, Ex. C ¶ 6.) However, Greene County issued quarterly Purchase of Services Orders ("PSOs") between July 1, 2006 and June 30, 2007, which authorized the provision of educational services by VIA to Johnnie. (Docket #127, Ex. C ¶¶ 7, 9, Ex. I.) Greene County was billed by VIA and paid for services rendered to Johnnie on a monthly basis during that time.[35] (Docket #127, Ex. C. ¶¶ 7, 10, Ex. K.)

On July 1, 2007,[36] prior to the start of the 2007-08 school year, Greene County CPMT and VIA entered into a new Principal Agreement which expired on June 30, 2008. (Docket #127, Ex. H.) The 2007 Principal Agreement was also a generic form services agreement available to Commonwealth agencies pursuant to the CSA. (Docket #127 ¶ 17.) Michael McKee, James E. Howard, and Amanda D. Long signed the 2007 Principal Agreement. (Docket #127, Ex. H.) Neither VIA nor Greene County CPMT drafted this agreement or made any

---

of development emotional or behavior problems, provide services that are responsive to the needs of troubled youth and their families, and encourage a public and private partnership in the delivery of those services. Va. Code Ann. § 2.2-5200.

[35] At the due process hearing, Randy Corpening testified that Greene County CPMT took over the payments of Johnnie's tuition at VIA in August, 2006. (R. at E p.203-04.) VIA often billed Greene County for less than the total units of educational service authorized by the corresponding PSO. (Docket #127, Ex. C ¶ 10.)

[36] Although the 2007 Principal Agreement states its effective date is July 1, 2007, the Agreement was not executed by VIA until July 18, 2007. (Docket #127, Ex. H.)

substantive changes to it. (Docket #127 ¶ 18.) Plaintiff was not a party to this contract. (Docket #127 ¶¶ 19-21, Ex. H.)

The Principal Agreement is designed "to address and contain all of the terms, parameters, guidelines, and expectations that must be met by any provider of services to any and all children under the care and responsibility of Greene County Community Policy and Management Team (CPMT)." (Docket #127, Ex. H.) The agreement further provides that it "may be terminated by either party with thirty (30) days written notice." (Docket #127, Ex. H.) The contract does not mention the IDEA by name but states that the agreement "is subject to the provisions of the Code of Federal Regulations, the amendments thereto, and relevant state and local laws, ordinances, regulations and pertinent health and behavioral health accreditation agencies/organizations." (Docket #127, Ex. H ¶ 1.)

Additionally, the Principal Agreement requires that a PSO be issued for any and all services to be provided by VIA (the Provider) to any child under the supervision or authority of Greene County CPMT (the Buyer). (Docket #127, Ex. H ¶ 4.A.) The Provider may terminate a PSO prior to its expiration in the event (a) the subject child commits a "serious incident,"[37] and (b) the Provider follows the notice requirements outlined in Paragraph 14, which include

---

[37] A serious incident is defined in the contract as follows:

> A serious incident includes, among others, abuse or neglect; criminal behavior; death; emergency treatment; facility related issues, such as fires, flood, destruction of property; food borne diseases; physical assault/other serious acts of aggression; sexual misconduct/assault; substance abuse; serious illnesses, . . . serious injury . . . ; suicide attempt; unexplained absences; or other incidents which jeopardize the health, safety, or well being of the youth.

(Docket #127, Ex. H ¶ 14.)

notifying the placing agency's case manager of the incident by the next business day and submitting a written report of the incident within 48 hours. (Docket #127, Ex. H ¶¶ 4.E, 14.) The agreement further provides that in the event of termination of the PSO, "all reasonable efforts will be made to give the Buyer *ten (10)* days written notice prior to termination or suspension of services to the child" and shall include the specific reasons for terminating or suspending services. (Docket #127, Ex. H ¶ 4.E (emphasis in original).)

Following a number of incidents in which Johnnie exhibited aggressive and/or self-injurious behavior, see supra § III.B., VIA's Board of Directors voted on December 3, 2007 to discharge Johnnie from VIA and terminate homebound services effective the next day. (R. at A2, B4, D36 Ex. B ¶ 8, D40 p.9; see also E p.197.) VIA notified the Smiths by letter dated December 3, 2007, with a copy sent to Greene County, that Johnnie's behavior had reached a level that was life-threatening, and his "need for support, accommodations and modifications exceed the capacity of VIA's program resources and facilities, both for school-based and home-bound services." (R. at A2.)

Greene County immediately began a search for a suitable alternative placement for Johnnie and offered to provide him with home-based educational services in the interim period. (R. at D40 p.10, E p.579-80.) The Smiths declined to take advantage of those services (R. at E p. 193, 228, 234) and were not available to meet with the IEP team to discuss placement options until December 19, 2007. (R. at D40 p.10, E. p.572.) The Smiths filed a due process complaint on December 21, 2007, and on January 4, 2008, Officer Hooe entered a stay-put order, placing Johnnie back at VIA. (R. at D1, 4.) Johnnie returned to school at VIA on January 8, 2008. (R. at E p.83.) After Johnnie engaged in further self-injurious behavior on January 15, 2008 (R. at C11) and an FBA report questioned the appropriateness of VIA's teaching methods, VIA

notified Greene County of its intent to terminate the 2007 Principal Agreement effective February 17, 2008. (R. at A11.) VIA also terminated the PSO pertaining to Johnnie,[38] giving Greene County ten (10) days written notice pursuant to Paragraphs 4.E and 14 of the Principal Agreement. (R. at A10, 11.) VIA cited the incident on January 15, 2008 in which Johnnie engaged in self-injurious behavior in support of its intention to terminate the contract. (R. at A11.) An incident report was filed on January 24, 2008 after Johnnie forced his way into other classrooms, leading to an evacuation of other students. (R. at A20, C12, 13, E p.384-85.) The Smiths chose not to return Johnnie to VIA after that day. (R. at E p.92-94, 178-80, 190-91; see R. at D36 Ex. B ¶ 21.) VIA stopped providing stay-put services on January 28, 2008, upon the advice of counsel. (R. at D40 p.10, E p.338-39.)

### B.    Standard of Review

Federal Rule of Civil Procedure 56(c) provides that a court should grant summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party initially bears the burden of demonstrating the absence of a genuine issue of material fact. Aiken v. Policy Mgmt. Sys. Corp., 13 F.3d 138, 141 (4th Cir. 1993). Upon that showing, the burden shifts to the non-moving party to "produce evidence, 'not mere allegations or demands, [which] set forth specific facts showing that there is a genuine issue for trial.'" Butler v. Navistar Int'l Transp. Corp., 809 F. Supp. 1202, 1205 (W.D. Va. 1991) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986)).

---

[38] It does not appear that there was a PSO issued for the first quarter of 2008. Rather, the last PSO expired on December 31, 2007. (Docket #127, Ex. I.) Indeed, Invoice #2665 from VIA to Greene County dated January 31, 2008 for services rendered January 8 – 28, 2008 notes at the bottom, "We have not received a quarterly PSO or 1/08 vendor invoice." (Docket #127, Ex. K.)

"Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248. "The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial," and there can be no genuine issue of material fact. Id. at 322-23; see also Anderson, 477 U.S. at 248 (finding that to preclude summary judgment, the dispute about a material fact must be "'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

## C.    *Discussion*

In the instant action, Plaintiff claims that VIA breached its 2007 Principal Agreement with Greene County CPMT to Plaintiff's detriment. Both VIA and Plaintiff have moved for summary judgment on this issue.[39] After review of the pleadings and consideration of the parties' arguments, the undersigned finds that Plaintiff does not have an actionable claim for breach of contract.

### 1.    Plaintiff's Third-Party Beneficiary Status.

Plaintiff claims VIA breached its 2007 Principal Agreement with Greene County CPMT, a contract to which Plaintiff is not a party. "[U]nder certain circumstances, a party may sue to enforce the terms of a contract even though he is not a party to the contract." Levine v. Selective

---

[39] Plaintiff has not responded to VIA's Motion for Summary Judgment.

Ins. Co. of Am., 250 Va. 282, 285, 462 S.E.2d 81, 83 (1995); see also Va. Code Ann. § 55-22.[40]

To have standing to sue on a breach of contract theory, Plaintiff must prove that the parties to the Principal Agreement "clearly and definitely intended" to confer a benefit upon him. Copenhaver v. Rogers, 238 Va. 361, 367, 384 S.E.2d 593, 596 (1989); see also Food Lion, Inc. v. S.L. Nusbaum Ins. Agency, Inc., 202 F.3d 223, 229 (4th Cir. 2000) (applying Virginia law).

"The essence of a third-party beneficiary's claim is that others have agreed between themselves to bestow a benefit upon the third party but one of the parties to the agreement fails to uphold his portion of the bargain." Copenhaver, 238 Va. at 367, 384 S.E.2d at 596. The third-party beneficiary need not be named in the contract; however, he must demonstrate that he was a direct beneficiary to the contract. Bank of Am. v. Musselman, 240 F. Supp. 2d 547, 554 (E.D. Va. 2003). Plaintiff cannot sue on a contract from which he benefits merely incidentally. Id. at 554; Copenhaver, 238 Va. at 367, 384 S.E.2d at 596. "[A]n incidental beneficiary is so far removed from the obligations assumed by the contracting parties that a court will not allow him to sue on that contract whereas an intended beneficiary is such an integral part of the obligations assumed by the contracting parties that a court will permit him to sue on that contract." Radosevic v. Va. Intermont Coll., 651 F. Supp. 1037, 1038 (W.D. Va. 1987). The four corners of the agreement reveal whether the contracting parties clearly and definitely intended to directly benefit a third party. Id. at 1039.

In the instant case, the four corners of the Principal Agreement do not establish a clear and definite intent to confer a benefit upon any individual student, including Johnnie Smith. It is undisputed that neither Johnnie nor his parents were parties to the contract. Johnnie's name is

---

[40] The court has exercised its supplemental jurisdiction over Plaintiff's state law breach of contract claim pursuant to 28 U.S.C. § 1367(a). Accordingly, the court must apply the substantive law of Virginia. Johnson v. Hugo's Skateway, 974 F.2d 1408, 1416 n.7 (4th Cir. 1992); Brown v. Mitchell, 327 F. Supp. 2d 615, 628 n.27 (E.D. Va. 2004).

not mentioned in the Principal Agreement. See, e.g., Radosevic, 651 F. Supp. at 1039 (finding the terms of the contract did not manifest clear and definite intent by parties to directly benefit plaintiff, and noting "[t]he contract does not mention Radosevic"). The Principal Agreement is a generic form agreement available to any agency of the Commonwealth contracting with a private entity to provide services to disabled or at-risk youth. (Docket #127 ¶ 17.) The contract language does not reveal any intent to benefit Johnnie specifically. Rather, the contract states that it was intended to contain all the terms and expectations that must be "met by any provider of services to *any and all children* under the care and responsibility of Greene County [CPMT]." (Docket #127, Ex. H (emphasis added).) But see Ogunde v. Prison Health Servs., Inc., 274 Va. 55, 63, 645 S.E.2d 520, 525 (2007) (finding plaintiff was intended beneficiary of contract between prison and medical services provider to provide health care for up to 6,000 inmates, including plaintiff).

The fact that Johnnie was the only Greene County student placed at VIA at the time the 2007 Principal Agreement was executed does lend weight to Plaintiff's argument that the parties intended to benefit him by entering into this contract. Indeed, in the IDEA context, courts have found that individual students can be third party beneficiaries to contracts with private schools providing for educational services. See, e.g., Bishop v. Oakstone Acad., 477 F. Supp. 2d 876, 887 (S.D. Ohio 2007) (finding plaintiff is third party beneficiary to contract for provision of plaintiff's education because he was the person the contract anticipated receiving the benefit of Oakstone's services); P.N. v. Greco, 282 F. Supp. 2d 221, 240 (D.N.J. 2003) (finding private school liable on third party beneficiary claim for breach of contract with school district providing for educational services to plaintiff). Unlike the contracts at issue in the cases of Bishop and P.N., the Principal Agreement in the instant case does not mention Johnnie by name or provide

for his education at VIA. It is not an enrollment agreement. It is a generic funding mechanism through which Greene County CPMT can purchase services from VIA under the CSA. Simply put, it cannot be said that the overriding intent of the parties in executing the Principal Agreement was to ensure Johnnie was educated at VIA. See Food Lion, 202 F.3d at 230 (noting that Food Lion's argument that it is a third party beneficiary to the contracts might have merit if the overriding intent of the contracting parties was to make sure Food Lion was fully compensated if one party defaulted (citing Copenhaver, 238 Va. at 368-69, 384 S.E.2d at 597)).

In fact, a Principal Agreement was executed by Greene County CPMT and VIA long before Johnnie enrolled at the private school. The parties executed this same generic contract[41] in 2005 when another Greene County student was placed at VIA. Plainly, the contracting parties did not intend to directly benefit any specific individual student. See Frank Brunckhorst Co., LLC v. Coastal Atl., Inc., 542 F. Supp. 2d 452, 459-60 (E.D. Va. 2008) ("Because Coastal Real Estate did not exist when Coastal and Brunckhorst entered into the distribution relationship, it clearly could not have been contemplated as a beneficiary of the contract agreed to by Coastal and Brunckhorst."); Caudill v. County of Dinwiddie, 259 Va. 785, 794, 529 S.E.2d 313, 317 (2000) (finding no provision of contract clearly and definitely showed intent to confer benefit on bondholders or Trustee and noting, "the Trustee and bondholders did not even exist when those contracts were executed."). This agreement is merely the contracting vehicle through which various agencies purchase services for disabled or at-risk youth. The specific agency purchasing services in this case – Greene County School Board – is not a party to the agreement. The contracting party is Greene County CPMT, which is made up of a number of different agencies, all of which can use this form agreement to purchase services from private entities. (See, e.g.,

---

[41]  The 2005 Principal Agreement and the 2007 Principal Agreement contain essentially the same terms. (Compare Docket #127, Ex. D with Ex. H.)

Docket #138, Ex. D, Ex. F.) Moreover, no Principal Agreement was executed for the 2006-2007 school year, even though Johnnie remained enrolled at VIA. The 2007 Principal Agreement at issue was not executed for over a year after Johnnie began school at VIA.

On the other hand, the Principal Agreement provides for issuance of a PSO, which refers to Johnnie by name and authorizes certain units of educational services to be provided by VIA. (Docket #127, Ex. I.) Taking the Principal Agreement and PSOs together, Johnnie was arguably an intended beneficiary of the contract.

This case presents a close question of law as to whether Johnnie is a third party beneficiary of the Principal Agreement and corresponding PSOs. Even assuming that he is so, however, it is recommended that the claim against VIA be dismissed as it is clear that there was no actionable breach of contract in this case.

### 2. Breach of Contract Claim.

Even if Johnnie could be considered a third party beneficiary of the 2007 Principal Agreement, he cannot prove breach of contract as a matter of law. In order to prevail on a breach of contract claim under Virginia law, Plaintiff must prove: "(1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation." Ulloa v. QSP, Inc., 271 Va. 72, 79, 624 S.E.2d 43, 48 (2006) (quoting Filak v. George, 267 Va. 612, 619, 594 S.E.2d 610, 614 (2004)). Plaintiff's claim falls short because there has been no actionable breach of the 2007 Principal Agreement, and Plaintiff has failed to establish a colorable claim for damages.

### i. The Principal Agreement does not confer IDEA liability on VIA.

Plaintiff argues VIA assumed IDEA obligations by contract, and that it breached those obligations when it suspended and discharged Johnnie from school. Contrary to Plaintiff's

assertions, the Principal Agreement makes no mention of the IDEA whatsoever. There is no ambiguity with respect to whether VIA contracted to comply with the IDEA and implementing regulations. See Wilson v. Holyfield, 227 Va. 184, 187, 313 S.E.2d 396, 398 (1984) ("Contracts are not rendered ambiguous merely because the parties disagree as to the meaning of the language employed by them in expressing their agreement."). Language conferring IDEA liability on VIA is simply absent from the terms of the contract.

The court must construe contracts as written without adding terms that were not contemplated by the parties. Heron v. Transp. Cas. Ins. Co., 274 Va. 534, 540, 650 S.E.2d 699, 702 (2007) ("The contract language contains no terms limiting the coverage to the use or operation of the vehicle in interstate commerce, and we will not read such absent terms into the contract the parties made."); see also Henrietta Mills, Inc. v. Comm'r of Internal Revenue, 52 F.2d 931, 934 (4th Cir. 1931) ("The courts will not disregard the plain language of a contract or interpolate something not contained in it."). Courts cannot create a new contract for the parties. Henrietta Mills, 52 F.2d at 934 ("The courts will not write contracts for the parties to them nor construe them other than in accordance with the plain and literal meaning of the language used."); Wilson, 227 Va. at 187, 313 S.E.2d at 398 ("It is the function of the court to construe the contract made by the parties, not to make a contract for them." (quoting Meade v. Wallen, 226 Va. 465, 467, 311 S.E.2d 103, 104 (1984)); Berry v. Klinger, 225 Va. 201, 208, 300 S.E.2d 792, 796 (1983) ("However inartfully it may have been drawn, the court cannot make a new contract for the parties, but must construe its language as written." (citing Quesenberry v. Nicols & Erie, 208 Va. 667, 159 S.E.2d 636 (1968)).

Courts have recognized that agencies may contract to require a private school to comply with the IDEA. See, e.g., St. Johnsbury Acad. v. D.H., 240 F.3d 163, 172-73 (2d Cir. 2001)

("We do not mean to imply that arrangements between a public agency and a private school are not enforceable against the private school."). However, in this case, VIA did not contract to assume IDEA liability, and the undersigned declines to read such a term into the parties' written agreement. See Wilson, 227 Va. at 187, 313 S.E.2d at 398 ("[C]ourts cannot read into contracts language which will add to or take away from the meaning of the words already contained therein."); see also Bridgestone/Firestone, Inc. v. Prince William Square Assoc., 250 Va. 402, 407, 463 S.E.2d 661, 664 (1995) ("[A] court cannot insert into a contract an exception or condition that the parties have failed to include.").

Plaintiff argues that the paragraph entitled "Adherence to Law" subjects VIA to IDEA compliance, as it states the contract "is subject to the provisions of the Code of Federal Regulations, the amendments thereto, and relevant state and local laws, ordinances, regulations and pertinent health and behavioral health accreditation agencies/organizations." (Docket #127, Ex. H ¶ 1.) However, this does not impose an affirmative obligation on VIA to abide by the IDEA or its implementing regulations. To interpret this provision in such a way would place no limits on the laws to which VIA bound itself by entering into this agreement. Additionally, if this language did confer IDEA liability on the Provider, all other private entities contracting with Greene County CPMT using this generic form agreement would have to comply with the IDEA. Certainly, this is not what the drafters of the contract intended. For example, Childhelp[42] and Family Preservation Service[43] did not contract to abide by the IDEA when executing a Principal Agreement with Greene County CPMT in July, 2005 and 2006, respectively. (Docket #138,

---

[42] Childhelp offers an array of child abuse prevention and education programs for child, families and professionals. See http://www.childhelp.org/regional/virginia2 (last visited Dec. 1, 2009).

[43] Family Preservation Services, Inc.'s mission is to ensure the provision of accessible, effective, high quality community-based counseling and social services as an alternative to traditional institutional care. See http://www.fpscorp.com/Services (last visited Dec. 1, 2009).

Ex. D, Ex. F.) In the same vein, this paragraph does not expressly require that VIA comply with the provisions of the IDEA, and IDEA compliance cannot be implied. See Wilson, 227 Va. at 187, 313 S.E.2d at 398 (finding courts cannot read into contracts language that will add to the meaning of the words contained therein).

Moreover, the IDEA specifically states that the SEA – not a private entity – is responsible for ensuring that the requirements of the IDEA are met.[44] 20 U.S.C. § 1412(a)(11); see Ullmo ex rel. Ullmo v. Gilmour Acad., 273 F.3d 671, 679 (6th Cir. 2001) ("Under the IDEA, the responsibility for ensuring that disabled students receive a free appropriate public education lies with the state educational agency (SEA)."); Gadsby ex rel. Gadsby v. Grasmick, 109 F.3d 940, 943-44 (4th Cir. 1997) (finding the IDEA places the ultimate responsibility for the provision of FAPE on the SEA); Bishop v. Oakstone Acad., 477 F. Supp. 2d 876, 883 (S.D. Ohio 2007) ("[I]n an IDEA action, a plaintiff's remedy is against the local school district who made the placement, not against the private school itself."). The regulations implementing the IDEA make clear that the IDEA applies only to public agencies, not to private schools. 34 C.F.R. § 300.2(b)(2). The public agency is responsible for ensuring that the rights and protections of the IDEA are given to disabled children placed in private schools. 34 C.F.R. § 300.2(c)(1); see also 34 C.F.R. §§ 300.146, 300.149. "Even if a private school or facility implements a child's IEP, responsibility for compliance with this part remains with the public agency and the SEA." 34 C.F.R. § 300.325(c). Additionally, Virginia regulations state that the responsibility for ensuring compliance with the IDEA lies with the local school division, not the private school. 8 Va. Admin. Code §§ 20-80-66(A)(1), (A)(6). The LEA must ensure that an IEP is "developed and implemented for each child with a disability served by that local educational agency,

---

[44] A Report and Recommendation finding VIA, as a private entity, was not subject to IDEA liability was adopted in its entirety without objection from any party. (Docket #88.)

including a child placed in a private special education school by . . . [a] local school division." 8 Va. Admin. Code § 20-80-62(A)(1); see also 8 Va. Admin. Code § 20-80-90(A) ("The local educational agency shall ensure that the rights and protections under this chapter are given to children with disabilities for whom it is responsible, including children placed in private schools.").

Regardless, even if the contract language were read to confer IDEA liability on VIA, Plaintiff still has no actionable breach of contract claim, as there has been no violation of the IDEA in the instant case. The undersigned agrees with the conclusion of the due process hearing officer that there has been no denial of FAPE, and thus no IDEA violation, in this case. See supra § IV.B.

*ii. VIA did not breach the termination provision of the contract.*

Plaintiff also asserts that VIA breached its contractual obligations by failing to abide by the termination provision contained in the Principal Agreement. The 2007 Principal Agreement provides that the contract "may be terminated by either party with thirty (30) days written notice." (Docket #127, Ex. H.) Plaintiff claims that by suspending Johnnie on November 8, 2007, discharging him on December 3, 2007, and terminating stay-put services on January 28, 2008, VIA breached this termination provision. (Plaintiff's Motion for Partial Summary Judgment on Contract Claims (Docket #161) at 17.)

What Plaintiff fails to recognize, however, is that the Principal Agreement is not an enrollment agreement. It neither mentions Johnnie by name nor provides for his enrollment at VIA. This is merely an umbrella agreement through which Greene County CPMT can purchase services from VIA under the CSA. The contract applies to any and all children placed at VIA for whom Greene County is responsible. (Docket #127, Ex. H.) It was not entered into solely for

the benefit of Johnnie, despite the fact that he was the only Greene County student placed at VIA at that time. The contract language specifically states that the agreement was intended to contain all the terms, parameters, guidelines, and expectations of the parties, and it does not provide for Johnnie's enrollment at VIA. (Docket #127, Ex. H.)

Accordingly, VIA was under no obligation to terminate the 2007 Principal Agreement when it suspended and discharged Johnnie from its program. VIA still provided homebound educational services to Johnnie after November 8, 2007, for which it was paid pursuant to the Principal Agreement and corresponding PSOs. Moreover, by discharging Johnnie from its program, VIA was not saying it would no longer accept Greene County students after December 3, 2007. Rather, it was making a decision pursuant to its internal policies and procedures about the enrollment of a particular student. (See Docket #127, Ex. P.) In the event Greene County wished to place other students at VIA after December 3, 2007, the Principal Agreement facilitated the purchase of those educational services.

VIA did, in fact, give notice on January 18, 2008 of its intent to terminate the 2007 Principal Agreement no later than February 17, 2008. (R. at A11.) Johnnie remained at VIA until January 24, 2008, when his parents decided not to return him to school. Given the fact that it was the Smiths who chose to end Johnnie's schooling at VIA after January 24, 2008, there can be no argument that VIA violated the notice requirements of the termination provision contained in the Principal Agreement in January, 2008.

Plaintiff also asserts that VIA did not properly terminate the PSO authorizing services for the period October 1, 2007 through December 31, 2007 ("Fall 2007 PSO"). The Principal Agreement requires a PSO be issued for any services VIA provides to any child under Greene County CPMT's authority or supervision. (Docket #127, Ex. H ¶ 4.A.) Pursuant to the contract

terms, the Provider may terminate a PSO prior to its expiration if the named child commits a serious incident, and the Provider notifies the placing agency's case manager of the incident by the next business day and submits a written report of the incident within 48 hours. (Docket #127, Ex. H ¶¶ 4.E, 14.) The agreement further provides that if a PSO is terminated, "all reasonable efforts will be made to give the Buyer *ten (10)* days written notice prior to termination or suspension of services to the child" and shall include the specific reasons for terminating or suspending services. (Docket #127, Ex. H ¶ 4.E.)

VIA did not terminate the Fall 2007 PSO on November 8, 2007 or December 3, 2007, nor was it required to do so. The PSO authorizes a maximum number of hours of educational services that may be provided for a particular student (Docket #127, Ex J); it does not mandate that a certain number of hours be rendered. In fact, VIA billed Greene County for services rendered on a monthly basis, often in an amount less than the number of hours authorized in the PSO. (See Docket #127, Ex. C ¶ 10.) On November 8, 2007, VIA suspended Johnnie from its in-school program but continued to provide homebound educational services, for which it invoiced and was paid by Greene County pursuant to the Fall 2007 PSO. (See Docket #127, Ex. K.) This was a change in the type of services rendered to Johnnie, not a suspension of services. After December 3, 2007, however, VIA terminated services to Johnnie and billed Greene County for the single day of services rendered in December. (Docket #127, Ex. J.) The Fall 2007 PSO expired by its own term on December 31, 2007. VIA provided fewer than the authorized units of service for the month, and billed Greene County accordingly. As VIA had no obligation to provide a specific number of hours of service under the PSO, it was not required to terminate the PSO.

Even if VIA's discharge of Johnnie operated as a constructive termination of the Fall 2007 PSO, Plaintiff was not harmed as a result of any breach of the PSO termination provisions set forth in Paragraph 4.E of the Principal Agreement. See Brown v. Harms, 251 Va. 301, 306, 467 S.E.2d 805, 807 (1996) (finding that essential elements of a breach of contract claim include proof of consequential injury or damage resulting from the breach). To be sure, Johnnie had been involved in a number of "serious incidents" as defined in Paragraph 14, and all parties were on notice of these incidents. (See R. at A12, C6, 7, 8; see also R. at A5, D40 p.7-8, E p.371-76.) The Principal Agreement merely requires that the Provider make *all reasonable efforts* to give the Buyer ten (10) days written notice prior to the termination or suspension of services to the child. (Docket #127, Ex. H ¶ 4.E (emphasis added).) However, given the escalating series of dangerous episodes involving Johnnie, and the concerns raised by Drs. Celiberti and Gerhardt regarding the appropriateness of VIA as an ongoing placement, VIA's Board of Directors voted to terminate services to him effective the next day, December 4, 2007. Under the unique circumstances of this case involving a series of physical dangers to Johnnie and VIA staff over the preceding month, the undersigned believes that reasonable notice was provided by VIA to Greene County and that there was no breach of the termination provision of the PSO.

Even if the notice is considered to be unreasonably short, however, and that ten (10) days notice should have been provided, the failure to provide such notice, under the particular facts of this case, is of no moment. Indeed, even if Greene County had ten (10) days notice that Johnnie's services at VIA would cease following the December 3, 2007 vote by VIA's Board of Directors, Greene County could not have pursued a different course of action or found an alternative placement in that period of time. Following Johnnie's discharge, Greene County immediately worked to find Johnnie an alternative placement and offered him homebound

49

services, which the Smiths declined. (R. at D40 p.10, E p.193, 228, 234, 579-80.) The Smiths were not available to hold an IEP meeting for over two weeks. (R. at E p.572.) Without their permission to exchange Johnnie's information with other residential facilities,[45] Greene County could not have found Johnnie a new placement within that ten (10) day period, as parental consent was required to exchange information with potential placements. (See R. at D36 Ex. B ¶ 9, E p.227.)

In sum, the undersigned does not believe that the December 3, 2007 notice provided in this case was unreasonable given the physical risk posed by Johnnie's continued placement at VIA, as reflected in the series of dangerous events of the preceding month. Beyond that, had ten (10) days notice been provided, nothing would have changed, as Greene County acted immediately to set up another placement and Johnnie's parents were unavailable to meet with Greene County throughout the entire period.

Nor was there any failure to provide notice of the termination of a PSO in January, 2008. In fact, no PSO was issued for the first quarter of 2008. Nevertheless, after Johnnie resumed schooling at VIA pursuant to the stay-put order and engaged in further self-injurious behavior (i.e., head-butting walls) on January 15, 2008, VIA gave written notice of the termination of both the Principal Agreement and PSO on January 18, 2008. Johnnie continued to attend school at VIA through January 24, 2008, at which time an incident report was filed concerning an episode involving Johnnie that required the evacuation of other students from the building. The Smiths chose not to return Johnnie to VIA thereafter. VIA stopped providing stay-put services on the advice of counsel on January 28, 2008, ten (10) days after giving written notice of termination of the PSO. Therefore, no violation of the notice requirement occurred.

---

[45] As there were no appropriate day placement programs in the area, residential placements were the option available. (R. at D36 Ex. B ¶ 9, E p.234-35.)

### *iii. Plaintiff has no recoverable damages.*

Plaintiff's breach of contract claim also fails because he cannot prove damages as a matter of law. "Proof of damages is an essential element of a breach of contract claim, and failure to prove that element warrants dismissal of the claim." Sunrise Continuing Care, LLC v. Wright, 277 Va. 148, 156, 671 S.E.2d 132, 136 (2009). Plaintiff bears the burden of proof in establishing with reasonable certainty the amount of damages he sustained as a result of the breach. Id. at 154, 671 S.E.2d at 135. "As a general rule, damages for breach of contracts are limited to the pecuniary loss sustained." Dunn Constr. Co. v. Cloney, 278 Va. 260, 266, 682 S.E.2d 943, 946 (2009) (quoting Kamlar Corp. v. Haley, 224 Va. 699, 705, 299 S.E.2d 514, 517 (1983)); Sunrise, 277 Va. at 156, 671 S.E.2d at 136; see also Regency Photo & Video, Inc. v. Am. Online, Inc., 214 F. Supp. 2d 568, 573-74 (E.D. Va. 2002) (applying Virginia law). Speculative and uncertain damages cannot form the basis of recovery because they cannot be established with reasonable certainty. Sunrise, 277 Va. at 154, 671 S.E.2d at 135.

Plaintiff does not seek monetary damages for his breach of contract claim. Nor does he ask for reinstatement at VIA. (R. at E p.367.) The only relief he requests is an award of compensatory education. (See Docket #94.) "Compensatory education involves discretionary, prospective, injunctive relief crafted by a court to remedy what might be termed an educational deficit created by an educational agency's failure over a give period of time to provide a FAPE to a student." G ex rel. SSGT. R.G. v. Fort Bragg Dependent Sch., 343 F.3d 295, 309 (4th Cir. 2003); accord Hogan v. Fairfax Co. Sch. Bd., 645 F. Supp. 2d 554, 2009 WL 2424690, at *13 (E.D. Va. Aug. 3, 2009).

Such an award may be appropriate relief for violations of the IDEA. Hogan, 2009 WL 2424690, at *13. However, in the breach of contract context, Plaintiff's damages claim makes

no sense. The remedy Plaintiff seeks against VIA can only be recovered from Greene County. See Hogan, 2009 WL 2424690, at *14 ("[T]he burden – the cost of providing the compensatory education – is borne solely by the school district."), see also Bishop v. Oakstone Acad., 477 F. Supp. 2d 876, 883 (S.D. Ohio 2007) (finding plaintiff's remedy is against the school district who made the placement, not against the private school). Plaintiff has no entitlement to compensatory education from Greene County, as the undersigned finds there has been no denial of FAPE. See supra § IV. Likewise, Plaintiff is not entitled to compensatory education from VIA, a private entity that is not subject to the IDEA. Compensatory education is simply not an appropriate remedy here.

Plaintiff makes no claim of pecuniary loss, nor has he provided evidence of out-of-pocket expenditures he incurred as a result of VIA's alleged breach of the Principal Agreement. He makes no claim for the monetary value of the compensatory education services he requests. Indeed, Plaintiff admits that he is unable to provide an exact value of the future costs associated with compensatory education. (Docket #127, Ex. B ¶ 12.) He asserts that any award of compensatory education must be provided after Johnnie is no longer eligible for services under the IDEA in order for it to be "meaningful."[46] (Docket #127, Ex. B ¶ 12.) Such speculative damages cannot be recovered, as Plaintiff cannot prove them with reasonable certainty. Shepherd v. Davis, 265 Va. 108, 125, 574 S.E.2d 514, 523-24 (2003). Without proof of this essential element of his claim, Plaintiff's breach of contract action fails as a matter of law.

---

[46] The IDEA requires that FAPE be provided to all children with disabilities between the ages of 3 and 21. 20 U.S.C. § 1412(a)(1)(A); 34 C.F.R. § 300.101(a). According to VIA, Johnnie will no longer be eligible for services under the IDEA in October, 2017. (See Docket #127 p.32.)

Accordingly, there is no genuine issue of material fact with respect to the viability of Plaintiff's breach of contract claim.[47] As such, the undersigned **RECOMMENDS** that VIA's Motion for Summary Judgment (Docket #126) be **GRANTED**, and that Plaintiff's Motion for Partial Summary Judgment on Contract Claims (Docket #161) be **DENIED**.

## VI. VIA'S COUNTERCLAIM

### A.   *Factual Background*

In its counterclaim against Plaintiff, VIA alleges defamation (Count I) and fraud (Count II). The bases for the defamation allegations are statements made by Johnnie Smith's parents during the course of administrative proceedings before the Virginia Department of Education ("VDOE"), in which they complained of Johnnie's dismissal from VIA, and letters they wrote to parents of approximately fifty-four (54) VIA students. VIA alleges the Smiths published defamatory statements, including the following: "VIA has failed to make home programming meaningfully available to VIA students and their families"; "VIA has failed to provide students appropriate services"; "VIA's management and particularly its executive director lacks sufficient clinical experience in autism and special education"; VIA "is failing to protect the rights and needs of its students and families"; and "VIA was operating in violation of federal and state law." (Docket #89, Counterclaim ¶¶ 62-63, 65-67.)

VIA's fraud claim alleges that Johnnie Smith's parents made intentionally false representations of material fact during the application process, on which VIA relied when admitting Johnnie to the school. Specifically, VIA alleges that the Smiths represented that they would be full participants in the home component of VIA's Applied Behavior Analysis approach

---

[47] The undersigned is able to rule on the parties' motions for summary judgment on the existing record; therefore the filing of John Smith's deposition transcript is not necessary. As such, it is **RECOMMENDED** that VIA's Motion for Leave to File Deposition Transcript Under Seal (Docket #184) be **DENIED**.

to autism education, and would move to Charlottesville as a family and "build their lives" around Johnnie Smith's placement at VIA. (Docket #89, Counterclaim ¶¶ 10-11.) VIA alleges that the Smiths represented during the application process that although Mr. Smith practiced law in Phoenix, Arizona, he planned to relocate to his law firm's Washington, D.C. office and work from home in the Charlottesville area as much as possible. (Docket #89, Counterclaim ¶ 19.) VIA alleges that contrary to these representations, John Smith continues to practice law in Phoenix and did not move his office to Washington, D.C. as represented in the application process. VIA claims that it relied on these representations, which were crucial to its decision to admit Johnnie to its program, to its detriment. Indeed, VIA asserts that it would have denied admission to Johnnie had it been advised that his father intended to remain in Phoenix. (Docket #89, Counterclaim ¶¶ 17, 21.) VIA alleges that Johnnie's violent behavior damaged the school, ultimately leading to Johnnie's dismissal and this protracted litigation. (Docket #89, Counterclaim ¶¶ 33-54.)

On June 18, 2009, Plaintiff filed a Motion to Dismiss the Counterclaim pursuant to Federal Rule of Civil Procedure 12(b)(6) (Docket #96), asserting that the counterclaim is unrelated to the claims brought in the Amended Complaint and that, as such, the court lacks jurisdiction over them. Further, Plaintiff asserts that certain statements made in the context of the administrative proceeding were privileged. Plaintiff also argues that VIA raised the counterclaims to needlessly broaden the litigation, distract the court, and personally attack the parents.

### B.    *Standard of Review*

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of a complaint to determine whether the plaintiff has properly stated a claim; it does

not "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." Republican Party of N.C. v. Martin, 980 F.2d 943, 952 (4th Cir. 1992). Although a complaint "does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (internal citations omitted); see also Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009).

Instead, "[f]actual allegations must be enough to raise a right to relief above the speculative level," Twombly, 550 U.S. at 555, with all allegations in the complaint taken as true and all reasonable inferences drawn in the plaintiff's favor. Chao v. Rivendell Woods, Inc., 415 F.3d 342, 346 (4th Cir. 2005); Warner v. Buck Creek Nursery, Inc., 149 F. Supp. 2d 246, 253 (W.D. Va. 2001). Therefore, while Rule 12(b)(6) does "not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face," plaintiffs must "nudge[ ] their claims across the line from conceivable to plausible" or their complaint must be dismissed. Twombly, 550 U.S. at 570; see also Iqbal, 129 S. Ct. at 1950-51.

### C.    *Discussion*

1.    Count I – Defamation.

Under Virginia law, a claim of defamation requires a "(1) publication of (2) an actionable statement with (3) the requisite intent." Jordan v. Kollman, 269 Va. 569, 575, 612 S.E.2d 203, 206 (2005). A statement is not actionable merely because it is false; it must also be defamatory, meaning it must "tend[ ] so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." Chapin v. Knight-Ridder, Inc., 993 F.2d 1087, 1092 (4th Cir. 1993) (quoting Restatement (Second) of

Torts § 559); Jordan, 269 Va. at 575, 612 S.E.2d at 206. If a statement is true, however, or substantially accurate, there can be no action for defamation. Jordan, 269 Va. at 575, 612 S.E.2d at 206; Saleeby v. Free Press, Inc., 197 Va. 761, 762-63, 91 S.E.2d 405, 407 (1956). Further, statements of opinion are ordinarily not defamatory because such statements cannot be objectively classified as true or false. Jordan, 269 Va. at 575-76, 612 S.E.2d at 206. As for the requisite intent required, the defendant may be found liable if the defendant knew the statement to be false or negligently failed to ascertain whether the statement was false. Gazette, Inc. v. Harris, 229 Va. 1, 15, 325 S.E.2d 713, 725 (1985).

At the motion to dismiss stage, a plaintiff's allegation of factual falsity is accepted as true. Chapin, 993 F.2d at 1092. Therefore, the threshold inquiry is whether the statements were defamatory. The law in Virginia for determining whether a statement is defamatory requires "the potential defamatory meaning of statements [to] be considered in light of the plain and ordinary meaning of the words used in context as the community would naturally understand them." Wells v. Liddy, 186 F.3d 505, 523 (4th Cir. 1999), cert. denied, 528 U.S. 1118 (2000). A defamatory charge may be express or implicit. Carwile v. Richmond Newspapers, 196 Va. 1, 7, 82 S.E.2d 588, 592 (1954) (noting that defamation "may be made by inference, implication or insinuation"). Thus, the court must look not only to the actual words spoken, but also to all inferences fairly attributable to them. Wells, 186 F.3d at 523.

In this case, VIA alleges that the Smiths defamed VIA by publishing, on February 20, 2008, certain statements to the VDOE in a document entitled "Compliance Complaint for Failure to Provide Appropriate Services" (hereinafter "Compliance Complaint"). This document asserted the following: "VIA has failed to make home programming meaningfully available to VIA students and their families"; "VIA has failed to provide students appropriate services";

"VIA's management and particularly its executive director lacks sufficient clinical experience in autism and special education"; VIA "is failing to protect the rights and needs of its students and families"; and "VIA was operating in violation of federal and state law." (Docket #89, Counterclaim ¶¶ 62-63, 65-67.) VIA further claims that the Smiths published these statements to approximately fifty-four (54) parents of VIA students by circulating a copy of the Compliance Complaint to them. (Docket #89, Counterclaim ¶ 69.)

These statements, taken in the context of their ordinary and common acceptance as the average citizen would understand them, and with every fair inference attributed to the statements, adequately satisfy the requirements of Federal Rule of Civil Procedure 12(b)(6). The average citizen could deduce from these letters that VIA fails to provide services for children with autism, including home programming; lacks clinical experience; fails to protect the rights and needs of autistic students; and violates federal and state law. As such, the letters are capable of being defamatory under Virginia law. Indeed, these statements could potentially be construed as defamatory *per se*, given that they arguably (1) impute an unfitness to perform the duties required of those charged to educate autistic and special education students; and (2) prejudice VIA in its profession or trade. Carwile, 196 Va. at 7, 82 S.E.2d at 591 (listing the four categories of defamatory words that are actionable without a showing of special damages). Accordingly, VIA has sufficiently alleged that the parents' publications constituted false and defamatory statements.

On the substance of the defamation claim, the parents argue only that their communication with the VDOE was privileged, and, as such, cannot give rise to liability. To be sure, false, misleading, or defamatory communications, even if published with malicious intent, are not actionable if they are material to, and made in the course of, a judicial or quasi-judicial

proceeding. Penick v. Ratcliffe, 149 Va. 618, 636-37, 140 S.E. 664, 670 (1927). "This absolute privilege has been extended to communications made in administrative hearings so long as the 'safeguards that surround' judicial proceedings are present." Lockheed Info. Mgmt. Sys. Co., Inc. v. Maximus, Inc., 259 Va. 92, 101, 524 S.E.2d 420, 424 (2000) (citing Elder v. Holland, 208 Va. 15, 22, 155 S.E.2d 369, 374 (1967)). "Those safeguards include such things as the power to issue subpoenas, liability for perjury, and the applicability of the rules of evidence." Id. at 101, 524 S.E.2d at 424. In Lockheed, the court rejected application of the defense of privilege in a bid protest before the Virginia Department of Social Services, holding that the safeguards identified in Elder were not present. Here, it cannot be determined from the pleadings whether such safeguards were present in the VDOE complaint process, and thus whether the privilege applies. As matters outside the pleadings are required to ascertain whether the statements made in the Smiths' complaint to the VDOE are privileged, Plaintiff's motion to dismiss on that issue must be denied. Further, even if the publication to the VDOE is privileged, it is difficult to see how the publication of these statements to approximately fifty-four (54) VIA parents is somehow privileged. Accordingly, it is **RECOMMENDED** that the Smiths' Motion to Dismiss (Docket #96) as to Count I, alleging defamation, be **DENIED**.

2.    Count II – Actual Fraud.

The elements of actual fraud in Virginia are: (1) a false representation; (2) of a material fact; (3) made intentionally and knowingly; (4) with intent to mislead; (5) reliance by the party misled; and (6) resulting damage to the party misled. Evaluation Research Corp. v. Alequin, 247 Va. 143, 148, 439 S.E.2d 387, 390 (1994). The burden is on the party charging fraud to prove it by clear and convincing evidence. Id.; Wolford v. Williams, 195 Va. 489, 498, 78 S.E.2d 660, 665 (1953).

The actual fraud alleged in this case consists of misrepresentations made by the Smiths. Specifically, the Smiths represented that they "would observe the techniques taught at VIA and would participate in VIA's home programming," (Docket #89, Counterclaim ¶ 10); that they "would be moving to the Charlottesville area and that they would 'build their lives' around Johnnie Smith's placement at VIA," (Docket #89, Counterclaim ¶ 11); and that "John Smith expressly stated to the Admissions Committee that he would transfer his legal practice to the Washington, D.C. office of his law firm and work as much as possible from home in the Charlottesville area." (Docket #89, Counterclaim ¶ 19.) In essence, the actual fraud alleged in this case is that "both parents would actively participate in the in-home activities and reinforcement that are an integral part of the VIA curriculum and educational approach;" and that "John Smith would relocate to the Washington D.C. area and actively participate in the in-home activities and reinforcement that are an integral part of the VIA curriculum and educational approach." (Docket #89, Counterclaim ¶¶ 79-80.)

The key to understanding the fraud count in VIA's counterclaim is the word "would," which appears in each of the fraud allegations. In essence, VIA alleges that the Smiths promised to perform two future acts if Johnnie was admitted to school at VIA: (1) the Smiths would actively participate in the home aspect of Johnnie's education; and (2) Mr. Smith would move his law practice to his Washington, D.C. office and try to work from the Charlottesville area as much as possible. There is no dispute that Mrs. Smith moved the family home from Tazewell to Greene County to facilitate Johnnie's enrollment at VIA. VIA's fraud claim is based on the fact that the Smiths allegedly did not participate in the home aspect of his education, and Mr. Smith did not move his law practice from Phoenix to Washington, D.C., as promised.

To be actionable, however, "fraud must relate to a present or a pre-existing fact, and cannot ordinarily be predicated on unfulfilled promises or statements as to future events." Soble v. Herman, 175 Va. 489, 500, 9 S.E.2d 459, 464 (1940). As the court noted in Lloyd v. Smith, 150 Va. 132, 145, 142 S.E. 363, 365 (1928):

> Were the general rule otherwise, every breach of contract could be made the basis of an action in tort for fraud. To permit an action for damages in favor of one who has no other ground for complaint, except an unfulfilled promise . . . , that is upon a broken contract, would ignore essential elementary distinctions, and in effect nullify the statute of frauds.

Plainly, both of the representations upon which VIA bases its fraud claim are promises as to future events: (1) to actively participate in home activities; and (2) to move the law practice from Phoenix to Washington, D.C. On their face, therefore, such statements are not present or pre-existing facts and are not actionable as fraud.

VIA argues, however, that fraud exists where it is alleged that the promises were made with the intention not to keep them. The Virginia Supreme Court held in Colonial Ford Truck Sales v. Schneider, 228 Va. 671, 677, 325 S.E.2d 91, 94 (1985), that:

> While failure to perform an antecedent promise may constitute breach of contract, the breach does not amount to fraud. But the promisor's intention—his state of mind—is a matter of fact. When he makes the promise, intending not to perform, his promise is a misrepresentation of *present* fact, and if made to induce the promisee to act to his detriment, is actionable as an actual fraud.

Likewise, in Lloyd, the court noted the exception to the general rule that a claim for fraud may not lie for promises as to future events:

> There are, however, some real and apparent exceptions. The courts are not agreed as to all of these exceptions, but there is much authority to the effect that an action in tort for deceit and fraud may sometimes be predicated on promises which are made with a present intention not to perform them. . . . It has been stated

that the gist of fraud in such case is not the breach of the agreement
to perform, but the fraudulent intent.

150 Va. at 145, 142 S.E. at 365; see also Sea-Land Service, Inc. v. O'Neal, 224 Va. 343, 351,

297 S.E.2d 647, 651-52 (1982).

While VIA generally alleges that the Smiths falsely represented that they would

participate in the home activities and that Mr. Smith would come to Washington, nowhere in the

lengthy counterclaim is it specifically alleged that at the time the Smiths made those promises,

they intended not to perform them. Such an allegation is critical to transform a garden-variety

breach of contract case into an action for fraud and is absent here. Unlike in Colonial Ford

Truck Sales, there is no allegation in this case that the alleged representations were "false and

fraudulent and known to be so when made." 228 Va. at 676, 325 S.E.2d at 94. Given the

strictures of Rule 9(b),[48] and the requirements of Virginia law, Count II of VIA's counterclaim

fails to state a claim for actual fraud, as it concerns misrepresentations as to the future, and the

counterclaim does not specifically allege that the Smiths intended not to fulfill those promises

when those promises were made. As such, it is **RECOMMENDED** that the Smiths' Motion to

Dismiss (Docket #96) as to Count II, alleging fraud, be **GRANTED**.

3.     Exercise of Supplemental Jurisdiction.

VIA's common law defamation claim lacks an independent basis for subject matter

jurisdiction, as neither federal question nor diversity jurisdiction exists. In such an instance,

whether the court may consider VIA's defamation counterclaim turns on whether it is

---

[48] Federal Rule of Civil Procedure 9(b) states:

> In alleging fraud or mistake, a party must state with particularity
> the circumstances constituting fraud or mistake. Malice, intent,
> knowledge, and other conditions of a person's mind may be
> alleged generally.

compulsory or permissive under Federal Rule of Civil Procedure 13. "If the counterclaim is compulsory, it is within the ancillary jurisdiction of the court to entertain and no independent basis of federal jurisdiction is required. If the counterclaim is permissive, however, it must have its own independent jurisdictional base." Painter v. Harvey, 863 F.2d 329, 331 (4th Cir. 1988).[49] Federal Rule of Civil Procedure 13(a) defines a counterclaim as compulsory if it "arises out of the transaction or occurrence that is the subject matter of the opposing party's claim." Painter involved the question of whether a defamation counterclaim was compulsory or permissive. In reaching the conclusion that the defamation counterclaim in that case was compulsory, the Fourth Circuit suggested four inquiries to be considered: (1) Are the issues of fact and law raised in the claim and counterclaim largely the same? (2) Would res judicata bar a subsequent suit on the party's counterclaim, absent the compulsory counterclaim rule? (3) Will substantially the same evidence support or refute the claim as well as the counterclaim? (4) Is there any logical relationship between the claim and counterclaim? The court noted that not all of these questions need be answered in the affirmative for the counterclaim to be compulsory, stating "[r]ather, the tests are less a litmus, more a guideline." Painter, 863 F.2d at 331.

As was the case in Painter, "[a]lthough the tests are four in number, there is an underlying thread to each of them in this case: evidentiary similarity." 863 F.2d at 331. As to inquiry (1), the factual and legal issues raised in the Amended Complaint and defamation counterclaim are in many respects very much the same. VIA asserts that the Smiths defamed the school by publishing statements alleging VIA operated in violation of federal and state law, failed to provide appropriate services, and failed to protect the rights and needs of its students and

---

[49] It is worth noting, as the district court did in Williams v. Long, 558 F. Supp. 2d 601, 603 n.1 (D. Md. 2008), the relative congruity between the requirement under Federal Rule of Civil Procedure 13(a) that the claim and counterclaim arise out of the same transaction or occurrence and that of the supplemental jurisdiction statute, 28 U.S.C. § 1367(a), that the claims be so related that they form part of the same case or controversy.

families. Determination of the truth or falsity of these statements will involve consideration of

the factual circumstances surrounding Johnnie's educational course and dismissal from VIA,

both of which underlie the Smiths' IDEA claim. Many of the same facts pertain to both the

claim and counterclaim, and many of the witnesses are likely to overlap.

As the Fourth Circuit held in Painter, "[w]here . . . the same evidence will support or

refute both the claim and counterclaim, the counterclaim will almost always be compulsory."

863 F.2d at 332. In Nammari v. Gryphus Enterprises LLC, No. 1:08cv134, 2008 U.S. Dist.

LEXIS 38944 (E.D. Va. May 12, 2008), the Eastern District of Virginia found a defamation

counterclaim to be compulsory to a Fair Labor Standards Act and ERISA claim, reasoning as

follows:

> There is an obvious logical relationship between the claims and
> counterclaims, and similar issues of fact raised in both. Although
> the legal standard for defamation is dissimilar from that for FLSA
> and ERISA claims, the question of the lawfulness of Mr.
> Nammari's termination undergirds both the claim and
> counterclaim. The Court therefore finds that it can answer the
> first, third, and fourth inquiries of the Fourth Circuit's litmus test
> for compulsory counterclaims in the affirmative.

Id. at *6. The same is true in this case.

As to the second factor, the Nammari court's analysis is equally applicable here.

The court reasoned:

> Although res judicata would be unlikely to bar Mr. Walsh's
> counterclaims in state court, he may well face an issue preclusion
> bar preventing relitigation of the facts held in common by the
> claim and counterclaim. This second question of the counterclaim
> test cannot be answered in the affirmative. However, the Fourth
> Circuit has held that "the res judicata test cannot be the controlling
> one" in determining whether a counterclaim is compulsory.
> Instead, "evidentiary similarity is the most important inquiry." For
> that reason, "and because there is both evidentiary similarity and a
> logical relationship between [Plaintiff's] original claims and [the]

counterclaims," the Court concludes that the counterclaims are compulsory within the meaning of Rule 13(a).

Nammari, 2008 U.S. Dist. LEXIS 38944, at *6-7 (internal citations omitted). As the same analysis controls here, the undersigned concludes that VIA's defamation counterclaim is compulsory, and the court has supplemental jurisdiction over it.

Pursuant to 28 U.S.C. § 1367(c)(3), however, the court may decline to exercise supplemental jurisdiction over a claim if the district court has dismissed all claims over which it has original jurisdiction. In this Report and Recommendation, the undersigned recommends dismissal of both the IDEA claim against Greene County and the contract claim against VIA. As such, the court has the authority under § 1367(c)(3) to decline to hear the sole remaining counterclaim, that of defamation. However, given the court's long history in dealing with this case, its familiarity with the alleged facts and study of the applicable law, the undersigned believes that it is appropriate to retain and adjudicate the remaining state law claim and **RECOMMENDS** that the court do so.

## VII. CONCLUSION

Accordingly, it is **RECOMMENDED** that Greene County's Motion for Summary Judgment (Docket #124) be **GRANTED**; Plaintiff's Motion for Partial Summary Judgment for Denial of a Free and Appropriate Public Education to Plaintiff Johnnie Smith (Docket #160) be **DENIED**; VIA's Motion for Summary Judgment be **GRANTED** (Docket #126); Plaintiff's Motion for Partial Summary Judgment on Contract Claims be **DENIED** (Docket #161); VIA's Motion for Leave to File Deposition Transcript Under Seal (Docket #184) be **DENIED**; and Plaintiff's Motion to Dismiss VIA's Counterclaim (Docket #96) be **DENIED** as to Count I (defamation) and be **GRANTED** as to Count II (fraud). It is further **RECOMMENDED** that the court exercise its supplemental jurisdiction and retain the defamation counterclaim.

The Clerk of the Court is directed immediately to transmit the record in this case to the Honorable Norman K. Moon, United States District Judge. Both sides are reminded that pursuant to Rule 72(b) they are entitled to note any objections to this Report and Recommendation within ten (10) days hereof. Any adjudication of fact or conclusion of law rendered herein by the undersigned not specifically objected to within the period prescribed by law may become conclusive upon the parties. Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1)(C) as to factual recitations or findings as well as to the conclusions reached by the undersigned may be construed by any reviewing court as a waiver of such objection.

The Clerk of the Court is hereby directed to send a certified copy of this Report and Recommendation to Plaintiff and counsel of record.

Enter this ___ day of December, 2009.

_____
Michael F. Urbanski
United States Magistrate Judge